78 N.J. Super. 168 (1963)
188 A.2d 179
DRUMMOND F. GAINES, PLAINTIFF-APPELLANT,
v.
MONROE CALCULATING MACHINE COMPANY, INC., ETC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 13, 1962.
Decided January 29, 1963.
*171 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Bernard Hellring argued the cause for appellant (Messrs. Hellring, Lindeman & Lieberman, attorneys; Mr. Philip L. Chapman, on the brief).
Mr. Everett M. Scherer argued the cause for defendants (Messrs. Riker, Danzig, Marsh & Scherer, attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
The Chancery Division granted defendants' motion for summary judgment dismissing the first three counts of plaintiff's four-count complaint, and "dismissing *172 those allegations contained in paragraph 1 of the Fourth Count which incorporate by reference the allegations of the First, Second and Third Counts." Plaintiff appeals. We pass the question whether the judgment is in the form required by R.R. 4:55-2 to make it appealable without our prior leave, since both sides seem to agree that it is.
The complaint was filed July 31, 1961 and named as defendants Monroe Calculating Company, Inc. (Monroe), Litton Industries, Inc. (Litton), Electro-Dynamics Stock Trust Fund, an unincorporated association of California (Electro-Dynamics), Foundation of the Litton Industries, a California corporation (Foundation), Fred R. Sullivan (Sullivan) and Charles B. Thornton (Thornton). Monroe, Litton and Sullivan appeared and filed answers; the others have not. There is nothing before us to indicate that plaintiff has made any effort to effect service of process upon the defendants who did not appear, in a fashion which would make a judgment binding upon them. Therefore, all references hereafter to defendants will mean the defendants who appeared.
On August 23 and 24, 1961, and before filing their answers, the defendants took plaintiff's deposition. On September 12 defendants filed their answers. On September 14 plaintiff served notice upon defendants of his intention to take the depositions, on September 25, of defendants and their directors, officers and supervisory personnel, and demanding production of documents and records. By agreement of counsel, the taking of the depositions was postponed to November  at the request of defendants, says plaintiff. On October 16 defendants served upon plaintiff notice of the application for summary judgment and "for an order staying the taking of the depositions * * * and the production of certain records * * * until such time as the defendants' motion for summary judgment shall be determined by the court." The result was that plaintiff did not have whatever benefit the depositions and the records he sought might have afforded him. This is of some significance in determining the propriety of the summary judgment because defendants *173 filed no affidavits and the motion for summary judgment was made (and granted) solely "upon the oral depositions given by the plaintiff on August 23 and 24" and the pleadings. Cf. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 76 (1954); Bilotti v. Accurate Forming Corp., 39 N.J. 184 (1963).
It is true that the complaint is, as defendants say, "verbose and confusing," and, as the trial judge found it to be, ambiguous, with the allegations pertaining to the two agreements hereafter mentioned "intermingled and juxtaposed with resulting confusion." However, the motion for summary judgment was granted essentially for the reason that none of the first three counts of the complaint, as amplified and particularized by plaintiff's deposition, stated a cause of action. In such a situation we search the complaint and the depositions "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." DiCristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252 (App. Div. 1957); cf. Judson v. Peoples Bank & Trust Co. of Westfield, supra; Bilotti v. Accurate Forming Corp., supra.
With these principles in mind we shall ignore the convolutions of the complaint and simply summarize the facts alleged therein and supported in plaintiff's deposition upon which plaintiff claims he is entitled to recover.
Plaintiff was a highly successful sales executive in the business machines field and, in 1959, was vice-president of Smith-Corona at $40,000 per year. In July of that year control of Smith-Corona changed hands and the new management asked plaintiff to surrender his contract. For this Smith-Corona offered to pay plaintiff his salary for the remaining term of the contract (which ran to early 1961), amounting to about $66,000, and to reimburse him for various expenses in the sum of about $9,000, on the sole condition that he not take employment with a competitor of Smith-Corona.
*174 When it became known in the industry that plaintiff was available, he received numerous offers, among the offerors being Litton and Toledo Scale Company. The Toledo offer appealed to plaintiff most because Toledo Scale was not a competitor of Smith-Corona, and plaintiff could take a position with them and still receive the $75,000 from Smith-Corona.
However, says plaintiff, Litton urged him to come with it and its subsidiary companies (among which is Monroe). Litton offered him the same salary he had been receiving at Smith-Corona, namely $40,000 per year. He told Charles B. (Tex) Thornton, president of Litton, and defendant Sullivan, president of Monroe, who were doing the urging, of the Smith-Corona $75,000 which he would forfeit if he turned down the Toledo offer and joined the Litton organization. Thornton replied that if plaintiff received $40,000 per year from Toledo and $40,000 per year more from Smith-Corona for the balance of his contract, "Uncle Sam would get the majority of it." Plaintiff testified that Thornton "mentioned that he, he and Mr. Sullivan, would offer me 1,500 shares of Litton Industries stock at one-half of the then current market value which was in the neighborhood of $100. This would make my cost of those 1,500 shares $75,000; but my profit on those 1,500 shares would be $75,000" which "would only be taxable at 25% long term capital gains." However, Thornton said this had to be done under a stock plan. Since the following excerpts from plaintiff's deposition contain the heart of the entire controversy, we quote them even though they are lengthy. Questioned by defense counsel, plaintiff testified (emphasis ours):
"Q. Well, tell us what he [Thornton] said would be your arrangement with Litton-Monroe or Litton if you came with them. A. What they were prepared to offer me was, one, a job as executive vice president with the possibility of becoming president in a year or a year and a half to take over the administrative duties of Mr. Sullivan, to relieve him to work on mergers and other acquisitions, it would be at an income rate of $40,000 a year which was the same that I was currently making; and they were prepared to offer me *175 1,500 shares of Litton stock which was selling for $100; and this then would have a net value before taxes of $75,000, the approximate figure that I had mentioned that I had coming to me from Smith-Corona, but that this was much more valuable to me than the Smith-Corona because it stood to appreciate and to increase in value as it had previously.
The one fly in the ointment was that when this stock option agreement had been set up originally in the forming of the corporation, because of its technical nature, the stock could only be exercised over a period of five years; this was a problem; and, therefore, they were, would do this, since it could not as the typical stock option be exercised immediately, they could not toy with it, as I understood it, lest those that had already been granted would be upset, but to recompense me for this $75,000 which I would forfeit from Smith-Corona by going to work, they would guarantee me non-cancelable, non-revocable, 1,500 shares of Litton stock; and that they  there seemed to be some question originally as exactly how they were going to do this; and it was stated to me very plainly that they would assure me and guarantee me five years employment so that I would receive the 1,500 shares of Litton stock.

* * * * * * * *
Now, I would definitely not, as I told them, have accepted the job with Litton-Monroe if there was any question about the $75,000 to recompense me for my loss under the Smith-Corona contract. So it was not that I was asking for an employment contract. It was their suggestion, it was not my suggestion as a means of guarantying the stock option; it was explained  that it was a highly technical nature  and it was explained that it could possibly yet prove that it was illegal; that they did not want to toy with it or upset it; but they would guarantee and assure me and promise me that I would have 1,500 shares of Litton stock.

* * * * * * * *
Q. Well, now, at this time did anyone mention the fact that there never were any contracts at Monroe-Litton for employment? A. No. It was mentioned, I think, this was an exceptional agreement only to get me, that they did not do this as a normal thing. Yes.
Q. They did not do what as a normal thing? A. Make such guarantees, that the stock option was designed for another purpose or so it seemed to me; but, my particular arrangement with them was  well, let us say like a bonus deal on a baseball players.
Q. So that as I understand it  and if my conclusion is incorrect, please say so  your position is that the stock option had nothing to do with the employment? A. No. It was to reimburse me or recompense me. I was not going to join the organization. I was not going to lose cash $75,000 by joining Litton-Monroe, see.
Now, to overcome this hurdle to my employment, I was very specifically offered a stock option calculated to amount to $75,000 as of that particular date, * * *

* * * * * * * *
*176 There was absolutely no misunderstanding that I was to get $75,000 guaranteed, promised; and we shook hands on this in a `gentleman's agreement,' as Mr. Thornton says, `from the South,' and `his word is his bond,' and with Mr. Sullivan and `happy to have you aboard.'"
Plaintiff accepted this proposition. He rejected the Toledo offer, surrendered the Smith-Corona contract, sold his home in New York, allegedly at a loss of $10,000, purchased and refurbished a home in New Jersey at a cost of $60,000 and, on September 23, 1959 reported to work at Monroe as executive vice-president. In October the stock option agreement was executed. It was dated September 24, 1959 and was between Electro-Dynamics as seller and plaintiff as buyer. It gave plaintiff the immediate right to buy the 1,500 shares of stock at $50 per share, but paragraph 5 provided (emphasis ours):
"5. Employment. If the Purchaser's employment with the Corporation and/or its subsidiaries and/or its affiliates is terminated voluntarily or involuntarily within five (5) years from the date of employment, then the Seller may, at its option, by the repayment to Purchaser of Ten (10¢) Cents for each share of stock subject to such unexercised options hereunder, declare this option agreement expired, and void of any further rights granted Purchaser hereunder, and/or may also, at its option, repurchase from Purchaser those shares of the Corporation's common stock resulting from the exercise of options hereunder and which are still subject to the restrictions of this agreement, at a price of Fifty and 10/100 ($50.10) Dollars per share * * *."
Plaintiff claims that Litton wanted him because it contemplated acquiring Underwood Typewriter and other like firms; that when it failed to do so it repented of its bargain with plaintiff, and, beginning in 1960, it started a campaign, through Sullivan and Monroe, to goad him into resigning by a series of minor and major meannesses, harassments, insults and, finally, invitations to resign. Plaintiff refused to budge, so, in April 1961, Sullivan discharged him without cause. Plaintiff telephoned Thornton for help, but the latter refused to interfere. Instead, on April 27, 1961, Foundation wrote plaintiff:
*177 "Dear Mr. Gaines:
Mr. Charles B. Thornton has advised us of your conversation with him relative to the termination of your employment with Monroe Calculating Machine Company. Mr. Fred Sullivan has confirmed that your employment with that company has been terminated as of April 8, 1961.
On September 24, 1959 a Stock Option Agreement was entered into between you and the Electro Dynamics Stock Trust Fund under which you were entitled to purchase 1,500 shares of the 10¢ par value common stock of Litton Industries, Inc. at a price of $50.00 per share, subject to restrictions specified in the Agreement. As a consequence of the two for one split of Litton Industries, Inc. common stock on December 4, 1959, the Stock Option Agreement covers 3,000 shares at $25.00 per split share. The cost of these options to you was 10¢ per optioned share, or $150.00 in total. As you know, on February 9, 1960 the Electro Dynamics Stock Trust Fund transferred to Foundation of the Litton Industries all of its interest in your Agreement.
The Foundation desires to exercise its rights under Section 8 of the Agreement. Accordingly, we are enclosing our check in the amount of $150.00 for repurchase of these options by the Foundation. We will appreciate the return to us of your copy of the Stock Option Agreement dated September 24, 1959.
 Sincerely yours,
 FOUNDATION OF THE LITTON INDUSTRIES
 By Glen McDaniel"
Plaintiff contends that the foregoing facts, if proved, gave him (1) a non-cancelable option to buy the 1,500 shares at $50 per share, and (2) the right to continue in defendants' employ for the balance of the five-year period.
The first count of the complaint sought specific performance of the employment contract "for the entire balance of said five year term" and to enjoin Sullivan and Monroe "from canceling the employment of plaintiff." Subdivision (a) of the second count demanded "the salary due to the plaintiff * * * for the balance of the said five year term," amounting to about $140,000. Against these demands defendants interposed the defense of the statute of frauds (R.S. 25:1-5(e)), the employment contract being oral and not to be performed within one year. Defendant Sullivan interposed the additional defense that his alleged guarantee was not enforceable because it was "a special promise to answer for the debt, *178 default or miscarriage of another," and not in writing as required by R.S. 25:1-5(b).
Plaintiff contended that the option agreement, construed in the light of the surrounding circumstances, does constitute a written note or memorandum of the employment agreement sufficient to satisfy R.S. 25:1-5(e). The trial judge disposed of this argument as follows:
"In that the stock-option agreement does not state any of the essential terms of the alleged oral contract, in and of itself, it may not be deemed an oral contract of employment. A memorandum of a contract must describe the terms therein with adequate certainty in order to sustain the inference that it was intended to be the written memorandum of the oral agreement. 4 Williston on Contracts, 3d Ed., § 576; Restatement, Contracts, Sec. 207; Gilbert v. Gilbert, 66 N.J. Super. 246, 252-253 (App. Div. 1961); 49 Am. Jur., Statute of Frauds, § 322 (1943).
Applying the above authority, it is patent that the option agreement is not a contract of employment in that none of the essentials of a contract of employment are manifested in said agreement."
We agree.
Plaintiff argues that he "ought not to be denied the opportunity of obtaining additional documents in possession of the defendants or others through the discovery process. The court below wrongly denied the plaintiff this opportunity and wrongly ruled that as a matter of law plaintiff could not prove by competent evidence that there had been the promises and offer he alleged." Plaintiff will be given the opportunity he seeks. If he discovers such evidence, he may, of course, apply to the trial court for appropriate relief.
In the second and third counts of the complaint there is, intertwined with other charges and demands, the claim that the option still subsists because "plaintiff has not terminated his employment with Monroe, either voluntarily or involuntarily," since he was discharged without cause and for the purpose, inter alia, of depriving him of the option, and therefore he is "entitled to receive all of the benefits of the said stock options promised by the said agreement and in accordance with said agreement and in accordance with said *179 promises and guarantees." The trial judge held that since plaintiff had no enforceable employment agreement, defendants had the right to discharge plaintiff at any time, even without cause, and that such a discharge terminated all of plaintiff's rights in the option. Here we think the trial judge erred.
The word "involuntarily" has no meaning so absolute that a court may accept it without regard to the context or the circumstances in which the word was used. If what plaintiff says is true, and at this point we must so accept it, the word "involuntarily" was not meant to, and therefore does not, include a discharge without cause, especially one made in bad faith for the purpose of destroying plaintiff's option. In this connection it must be noted that the option did not automatically terminate with the ending of plaintiff's employment, voluntary or involuntary, but could be terminated by the "seller" only "at its option."
If what plaintiff says it true, and if the "seller" is an agency of the defendants, the defendants and the "seller" may be estopped from terminating the option. As we said in Abeles v. Adams Engineering Co., Inc., 64 N.J. Super. 167, 178 (App. Div. 1960), judgment modified 35 N.J. 411 (1961):
"One cannot utilize advantageously his own default as an exit of escape from the performance of his contractual obligations. 3 Williston, Contracts, (rev. ed. 1936), par. 677, p. 1952; Restatement, Contracts, par. 295, p. 438 (1932). He who prevents a thing from being done may not avail himself of the non-performance which he himself has occasioned. Keifhaber v. Yannelli, 9 N.J. Super. 139, 142 (App. Div. 1950)."
As is said in paragraph 295, p. 438 of Restatement, Contracts:
"If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened non-performance of the return promise does not discharge the promisor's duty, unless
*180 (a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party; or
(b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party."
If the facts and circumstances alleged by the plaintiff are true, it is inconceivable that the parties meant by the word "involuntary" that the plaintiff took the risk of losing $75,000 if defendants chose to discharge him at any time, even within a few days or weeks, and without cause. In any event, that construction is so debatable that the trial judge should not have adopted it on the basis of what was before him on the motion for summary judgment. Cf. Casriel v. King, 2 N.J. 45 (1949); Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1954); Krosnowski v. Krosnowski, 22 N.J. 376 (1956).
Defendants argue that plaintiff made no tender of the option price for the shares. According to the terms of the option, it could be exercised as to all of the shares at any time, but had to be exercised as to the first 20% of the shares within two years, and 20% more was to be paid for each six months thereafter. All options not exercised at the times stipulated were to "be considered forfeited to the seller." On the other hand, even if the shares were paid for, all of them were subject to repurchase by the "seller" in the event of the termination of the employment before the end of three years, and portions of the stock (not pertinent here) were so subject if the employment ended after three years but before five years. We hold that since defendants declared the option terminated prior to the time when the first 20% had to be paid for, a tender for the stock was excused because it is obvious it would have been refused.
Defendants argue further that the option agreement can not be enforced because Foundation is a necessary party and has not been served. However, that did not justify the entry of summary judgment in favor of defendants. Goldenberg v. Sebersky, 30 N.J. Super. 596 (Cty. Ct. 1954). *181 Plaintiff should be given the opportunity to bring in Foundation, if he can. It was said in the April 27, 1961 letter from Foundation to plaintiff, quoted above, that Electro-Dynamics, named as seller in the stock option, had transferred to Foundation "all of its interest in your agreement." In spite of this transfer, Electro-Dynamics may still remain liable to plaintiff. If plaintiff thinks so, he should be given the opportunity to serve Electro-Dynamics as well. In addition, plaintiff may be able to prove that Foundation or Electro-Dynamics is so owned and controlled by the defendants who were served as to make them bound by any judgment entered herein, or those served may be compelled to cause Foundation or Electro-Dynamics to deliver the stock. Furthermore, even if delivery of the stock cannot be ordered because the "seller" is not before the court, a money judgment for the loss of the bargain may be awarded against any defendant before the court who is found to be responsible for the wrongful termination of the option.
However, even if "involuntarily" is construed as excluding discharge not for cause, and the option is preserved, it still does not give plaintiff the right to employment or salary for the balance of the five years. We lay aside the fact that employment contracts are not specifically enforceable.
Plaintiff argues that defendants promised him employment for five years and are estopped from raising the defense of the statute of frauds against enforcement of that promise because he gave up the Smith-Corona $75,000, refused other employment offers, sold his home in New York at a loss, and bought and furnished a New Jersey home at a cost of $60,000 in reliance upon that promise. The trial court rejected this argument on the authority of Deevy v. Porter, 21 N.J. Super. 278 (App. Div. 1952), affirmed 11 N.J. 594 (1953), and Kooba v. Jacobitti, 59 N.J. Super. 496 (App. Div. 1960). Plaintiff argues those cases are distinguishable; that in no previously reported New Jersey case did the plaintiff allege that in reliance upon the oral promise he had made so radical a change in position and suffered such great detriment *182 as shown here. Therefore, says plaintiff, we should apply to this case the principles laid down in Cauco v. Galante, 6 N.J. 128 (1951), Alaska Airlines v. Stephenson, 217 F.2d 295 (9 Cir. 1954) and Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88 (Sup. Ct. 1910), reversed on other grounds 162 Cal. 318, 122 P. 847 (Sup. Ct. 1912).
The difficulty that meets plaintiff at the threshold of this argument is that plaintiff did not bargain for or rely upon the promise of five years' employment. What he sought, bargained for and relied upon was the promise of a five-year stock option, guaranteed against cancellation. The mention of five years' employment was merely incidental to the assurance given plaintiff that the option would not lapse. As plaintiff himself says in his brief (emphasis ours):
"The defendants then explained to the plaintiff that in order that he could exercise the stock options under the terms of the underlying option agreement they would assure and guarantee him five years employment. This Mr. Gaines had never sought nor did he bargain for. He had only told them that he would not accept any job with Litton-Monroe if there was any question about his getting at least the equivalent of the $75,000 in benefits he stood to lose in the process. So the defendants suggested as a means to a guaranteeing the stock options five years employment. But in making this offer, however, they by no means connoted that the options could otherwise be cancelled. They inferred that they even might go about this by making a change in the stock option plan. * * * This then was an offer for a unilateral contract; if Mr. Gaines would come and commence employment with Litton at Monroe, he would be given irrevocable and non-cancellable stock options then and there to compensate him for what he would lose in that very act."
If plaintiff keeps his option, he will receive all that he sought and relied upon when he gave up the Smith-Corona $75,000, made the other moves and disbursements, and joined defendants. He is entitled to no more. Cf. Kufta v. Hughson, 46 N.J. Super. 222 (Ch. Div. 1957).
For the foregoing reasons, the judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion. Plaintiff should forthwith bring in such other parties as he can, promptly take the depositions he *183 seeks, and amend his complaint to make it clear and succinct and to add such other counts as he may deem necessary after the completion of the discovery, not inconsistent with this opinion. Plaintiff argues that "The court below was in error in dismissing the plaintiff's cause of action for damages by way of restitution for the value of the benefits from Smith-Corona which he forfeited by the act of rendering the required performance to the defendants," and that "Plaintiff is at least entitled to the balance of his salary for the year October 1960 to September 1961 on a contract arising by operation of law and not within the Statute of Frauds and the court was in error in dismissing this cause of action as a matter of law." Neither of these claims was presented to the trial court. We express no opinion as to the merits of either of them. If plaintiff wishes to pursue them, they should be specifically alleged in the amended complaint.
Costs to abide the event.