Frank BUYSSE, Appellant, Cross-Appellee,

v.

PAINE, WEBBER, JACKSON & CURTIS, INC., Appellee, Cross-Appellant.

Nos. 79–1605, 79–1683.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1980.

Decided May 28, 1980.

Rehearing Denied July 29, 1980.

---

Geoffrey P. Jarpe (on briefs), Maun, Green, Hayes, Simon, Murray & Johanneson, St. Paul, Minn., for appellant, cross-appellee.

Maclay R. Hyde (on briefs), Lindquist & Vennum, Minneapolis, Minn., for appellee, cross-appellant.

Before LAY, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

LAY, Chief Judge.

The district court entered judgment in favor of Frank Buysse, a stockbroker employed by Paine, Webber, Jackson & Curtis, Inc. (PWJC), for his role in obtaining business for his employer. PWJC is a stock brokerage and investment banking firm. Buysse has appealed claiming an inadequate award; PWJC has cross-appealed from the judgment made. We vacate the judgment and remand for entry of a modified judgment by the district court.

Buysse began working for PWJC as a stockbroker in 1969. In October, 1971, PWJC formed its Public Finance Department. Shortly thereafter, the company's policy with regard to compensation of stockbrokers who introduce investment banking business to PWJC was formulated. A manual was published and distributed outlining the policy.[1]

1. The manual states in part:

 COMPENSATION TO STOCKBROKERS
 A. GENERAL

 The PWJC policy is to reward Stockbrokers out of the net income derived from investment banking business that they introduce to PWJC. It is important, therefore, that the introduction be clearly documented as outlined in the section "Procedures". There are many investment banking leads that appear to the Stockbroker and to his Branch Manager to be worth pursuing but which for one reason or another never develop to the point where a fee is generated. Therefore, the original memo which includes a statement of the nature and extent of the introduction by the Stockbroker need not be sent to anyone other than the Branch Manager and the Regional Representative or other members of the Corporate Finance Department designated to coordinate the new business activities of the originating office. However, once a lead develops to the point where a transaction is imminent, copies of the original memo will be sent by the person in the Corporate Finance Department working on the business to the Director of the Investment Banking Division, the Associate Director and the Officer-in-Charge of the Corporate Finance Department.

 The amount of compensation payable (within the ranges outlined below) will depend upon the effectiveness of the introduction. Thus, maximum compensation will be payable where the company (municipality or governmental unit) was not previously known to the Investment Banking Division, the Stockbroker has a close personal or business friendship with the decision-making officers of the company (officials of the municipality) and the Stockbroker is the effective cause of the business coming to PWJC. On the other hand, a lesser compensation would be payable when PWJC already has a good entree to the management of the company but the Stockbroker performs an effective introduction to another channel of the company. Little or no compensation will be pay-

In June of 1971, the Minnesota Legislature created the Minnesota Housing Finance Agency (MHFA) and gave it the authority to issue notes and bonds to aid in the construction of housing for low and moderate income families. Initially, the MHFA was limited to the issuance of $150,000,000 in notes and bonds. The amount was later increased to $645,000,000.

The MHFA hired an executive director, James Dlugosch, in the fall of 1971, and work progressed toward the initial offering of its bonds. Mr. Dlugosch attended an industry conference in Detroit in January of 1972, where he was contacted by representatives of 15 to 20 investment banking firms including PWJC. Thomas Caine, a member of PWJC's Public Finance Department, and Joseph Luby, head of PWJC's Public Finance Department, contacted Mr. Dlugosch at the Detroit conference to discuss the possibility of the MHFA selling bonds and to offer PWJC's services to the MHFA as managing underwriter. Mr. Dlugosch suggested that it was too early for the agency to consider proceeding with any bond issuance at that time but that Mr. Caine should call him back in approximately two months.

Following the Detroit conference, and independent of the efforts made by PWJC, Buysse attempted to obtain the MHFA business for his employer. In late January or early February, Buysse contacted Thomas Kelm, at that time the Administrative Assistant to Governor Anderson, to arrange a meeting concerning the MHFA. Buysse and Kelm had been roommates for one year during their college years but had seen each other infrequently since that time. The meeting lasted for only an hour but Kelm did refer Buysse to Dr. Gerald Christianson who was on the board of the MHFA.

able for a casual introduction when the Stockbroker has no previous relationship with the company or its important officers.

The amount payable will *not* be dependent on the amount of work done by the Stockbroker. *In most cases, the Corporate Finance Department will be in a better position to determine how to develop the prospect and therefore will have primary responsibility for contacts with the company once the introduction has been effected. In some cases, it will be desirable to have the introducing Stockbroker as a member of the Investment Banking team; in other cases this will not be necessary. The decision as to how to proceed will remain with the Corporate Finance Department. Accordingly, the degree of compensation to the Stockbroker will not, as a matter of fairness and PWJC policy, depend in any way on his participation in discussions and negotiations after the initial introduction.*

B. THE SCALE OF COMPENSATION

The PWJC Stockbrokers have historically received generous compensation for introducing investment banking clients. The scale of payment is equal to or greater than that of our competitors.

For the initial revenue-producing transaction completed with a company introduced by a Stockbroker, the scale of payment is as follows:

1. Corporate Underwritten Public Offerings—20% of the net management fee received by PWJC.

2. Private Placements—10–20% of the net fee received by PWJC, the exact amount to be determined by the Director of Corporate Finance.

3. Mergers and Acquisitions—10–20% of the net fee received by PWJC, the exact amount to be determined by the Director of Corporate Finance.

4. Financings handled by Real Estate Finance Department—

(a) Underwritten Public Offerings—20% of PWJC's net management fee.

(b) Other revenue producing transactions—10–20% of the net fee determined case by case by the Director of the Real Estate Finance Department.

5. Financings handled by the Public Finance Department—

(a) Underwritten Public Offerings—20% of PWJC's net management fee.

(b) Other revenue producing transactions—10–20% of the net fee determined case by case by the Director of the Public Finance Department.

THE PAYMENTS WILL BE PAID BY CHECK DIRECTLY TO THE STOCKBROKER CONCERNED. An introducing Stockbroker will be compensated, at a reduced scale, on subsequent financings so long as he remains in PWJC's employment.

On all occasions that a Stockbroker is compensated for introducing a revenue producing investment banking transaction, the supervising Branch Office Manager will also be compensated. This payment will be made at the time the Stockbroker is rewarded and will be in the amount of approximately 15% of the Stockbroker's payment.

Buysse's sister is married to Dr. Christianson's brother but their relationship was quite casual, based solely on the family connection. Prior to the events forming the basis of this lawsuit, they had met only three to five times. Buysse had a brief meeting with Dr. Christianson who referred him to Mr. Dlugosch.

Ultimately, Buysse had a two hour meeting with Dlugosch, with whom he had had no prior contacts, and reported his meeting to PWJC's Regional Manager. Several days later, Buysse and Dlugosch met again, along with the head of PWJC's Municipal Bond Department in the Minneapolis office. They discussed the MHFA's need for a financial advisor and PWJC's goal of being named managing underwriter for any bonds issued by the MHFA. Mr. Dlugosch requested that PWJC present a proposal to the MHFA to become its advisor and managing underwriter. Buysse contacted Mr. Luby and told him about the meeting with Dlugosch. Mr. Luby then had a proposal prepared to take to the MHFA.

On March 6, 1972, several PWJC employees, including Buysse, attended a luncheon meeting with Mr. Dlugosch and members of the MHFA board of directors to discuss the details of PWJC's proposal regarding its desire to become financial advisor and ultimately managing underwriter to the MHFA. As a result of that meeting PWJC was appointed financial advisor to the MHFA. At that time, the agency was not in a position to select a managing underwriter.

Ben Bedford of PWJC was assigned to be the liaison man with the MHFA, but Mr. Luby was in charge of the overall MHFA operation for PWJC. Mr. Buysse continued to keep in touch with Mr. Dlugosch, regarding PWJC's role as financial advisor, even though he was not required to do so. Some time after the March 6, 1972, meeting, Dlugosch expressed his dissatisfaction with PWJC because of Mr. Bedford's failure to respond to Dlugosch's correspondence. Mr. Buysse assured Mr. Dlugosch that Bedford would be removed as the liaison man and PWJC would get back on track. Bedford's

replacement, Mr. Caine, performed satisfactorily as far as Mr. Dlugosch was concerned.

On November 10, 1972, the MHFA decided that it should appoint a managing underwriter and directed Mr. Dlugosch to solicit proposals for that position. He sent letters to a number of investment banking firms asking for proposals. The MHFA appointed a subcommittee on December 8, 1972, to review the proposals that had been submitted by a number of firms including PWJC.

In early 1973, a rumor was circulating that Goldman Sachs, another investment banking firm, had been selected as the managing underwriter for the MHFA. PWJC arranged a meeting with Mr. Kelm, at which Mr. Buysse was present, to discuss the rumor. Mr. Kelm said there was nothing he could do for them. Mr. Buysse then contacted Dr. Christianson and told him about the rumor and said that PWJC was very disappointed that they had not been chosen as the managing underwriter. Dr. Christianson checked out the rumor and called Buysse back with the news that PWJC had been selected. The subcommittee's recommendation was formally adopted at the MHFA meeting of February 9, 1973.

PWJC was co-underwriter with the firm of Piper, Jaffray & Hopwood which required them to split the management fee with that firm. On August 23, 1973, the MHFA sold its first public offering of bonds in the amount of $30,000,000. PWJC earned a net management fee of $81,000 for this sale. PWJC gave Buysse $11,580 as compensation for being the introducing broker. According to PWJC's Investment Banking Services manual, the introducing broker is entitled to compensation in the amount of 20% of the company's net management fee, in this instance $16,200.

On September 19, 1974, the MHFA sold its second public offering of bonds in the amount of $53,930,000 and PWJC earned a net management fee of $94,447. Initially, PWJC offered Buysse only $500 as his share of the fee. Upon his objection, they offered him $2,500 and upon further objection finally offered him an additional $2,500, for a

total of $5,000. Mr. Buysse continued to dispute the amount that was owed to him.

Two more public offerings of MHFA bonds were made prior to Buysse's discharge. On September 24, and November 20, 1975, the MHFA sold bonds in the amount of $8,985,000 and $18,640,000, respectively. PWJC earned an aggregate net management fee from these two sales of $64,402. Buysse did not receive any compensation from these sales, even though he was aware of them and requested that he be paid the compensation to which he was entitled.

On January 28, 1976, Buysse filed this suit for recovery of compensation he claims PWJC owes to him. One week later, he met in New York City with officials of PWJC to attempt a resolution of the compensation problem. Plaintiff was told that if he maintained his lawsuit he would be jeopardizing his employment with PWJC. On March 22, 1976, with Mr. Buysse's litigation still pending, PWJC terminated his employment.[2]

Between the time Mr. Buysse's employment was terminated and the time of the trial, PWJC had acted as managing underwriter in several additional public offerings of MHFA bonds the total amount of which is $584,610,000. PWJC's total management fees on these offerings are $673,299.84. Buysse has received no compensation from these post-termination offerings. PWJC, as of the time of the trial, continued to be the managing underwriter for the MHFA bond offerings.

In addition to the fees it earned as managing underwriter for the MHFA's public bond offerings, PWJC has also earned fees for work involved with the MHFA State-Home Improvement Program, 1976 Series A and 1977 Series A. The fees were $30,-

895 and $23,670 respectively and were advisory fees which are different than the management fees charged for the public offerings, and which were negotiated with the agency. Mr. Buysse claims that these too are subsequent financings within the meaning of the contract outlining compensation to stockbrokers for investment banking introductions.

The district court held Buysse is entitled to a full 20% of the management fee of $81,000 on the initial underwriting. The court further held Buysse is entitled to 5% of the management fee on all subsequent financings of MHFA offerings until Buysse reaches the age of 65. The court included the advisory fees charged for work with the MHFA State-Home Improvement Program, 1976 Series A and 1977 Series A.

Plaintiff appeals from the judgment, claiming that the district court erred in its decision that "reduced scale" in this instance meant only 5%. The plaintiff also asserts error in the district court's decision to terminate his compensation at age 65. PWJC cross-appeals claiming that the district court erred in awarding Buysse any compensation beyond the date at which his employment was terminated.

Both parties agree that Minnesota law governs. They also agree that an employment contract which does not specify a termination date is deemed terminable at will under Minnesota law. *Lundeen v. Cozy Cab Manufacturing Co.*, 288 Minn. 98, 179 N.W.2d 73 (1970); *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 117 N.W.2d 213 (1962); *Degen v. Investors Diversified Services, Inc.*, 260 Minn. 424, 110 N.W.2d 863 (1961).

Buysse urges the district court properly held that:

> We believe that our relationship as employer and employee has been irreparably harmed as a result of the dispute between us over the fees you claim from the Minnesota Housing Finance Agency underwritings. We are defending your claim and we believe that the morale of our office and Paine, Webber's conduct of the lawsuit would be impaired by your continuing employment.

---

**2.** The letter notifying Mr. Buysse of PWJC's decision to terminate his employment reads in part:

> Dear Frank:
> This is to notify you that your employment with Paine, Webber, Jackson & Curtis, Inc., is terminated, effective at the close of business March 22, 1976.

[W]hile the employer may decide to terminate the employee's employment, the employee is still entitled to ongoing compensation under the compensation contract. Since the compensation contract had been performed by the employee, there is no way that the employer can properly terminate the earned and vested right to compensation along with the employment itself, *when the employment is terminated because the employee seeks to vindicate his rights under the compensation contract.*

Buysse relies on numerous cases. *Randolph v. New England Mutual Life Insurance Co.*, 526 F.2d 1383 (6th Cir. 1975); *Potomac Chemical Co. v. Chapman*, 146 F.2d 664 (D.C.Cir.1944), *cert. denied*, 324 U.S. 881, 65 S.Ct. 1028, 89 L.Ed. 1432 (1945); *Tahir Erk v. Glenn L. Martin Co.*, 116 F.2d 865 (4th Cir. 1941); *Baum Associates, Inc. v. Society Brand Hat Co.*, 340 F.Supp. 1158 (E.D.Mo. 1972), *aff'd*, 477 F.2d 255 (8th Cir. 1973); *Fortune v. National Cash Register Co.*, 77 Mass.Adv.Sh. 1569, 364 N.E.2d 1251 (1977); *Muller Enterprises, Inc. v. Samuel Gerber Advertising Agency, Inc.*, 182 Neb. 261, 153 N.W.2d 920 (1967); *Gaines v. Monroe Calculating Machine Co.*, 78 N.J.Super. 168, 188 A.2d 179 (1963). The distinguishing feature of this case is the contract clause relied on by PWJC which reads: "An introducing Stockbroker will be compensated, at a reduced scale, on subsequent financings *so long as he remains in PWJC's employment.*" (Emphasis added). Several of the cases cited by Buysse involve either motions to dismiss or summary judgments in which there were allegations of bad faith.[3] These cases generally acknowledge that an employee who is working under an employment contract which is terminable at will cannot be cut off from his entitlement to future compensation if his discharge is in bad faith.[4]

■ If the defendant's termination of Buysse's employment was for the purpose of depriving him of his commissions, this would constitute bad faith. *Potomac Chemical Co. v. Chapman*, 146 F.2d 664 (D.C.Cir.1944), *cert. denied*, 324 U.S. 881, 65 S.Ct. 1028, 89 L.Ed. 1432 (1945); *Fortune v. National Cash Register Co.*, 77 Mass. Adv.Sh. 1569, 364 N.E.2d 1251 (1977). Here, however, the district court found that the principal reason for plaintiff's termination was "*[T]he continuing dispute over fees and plaintiff's maintenance of this civil action to collect them.*" *Buysse v. Paine, Webber, Jackson & Curtis, Inc.*, No. 4–76 Civ. 37 p. 8 (D.Minn. April 26, 1979) (emphasis added).

■ We agree with the district court's finding that the cause of plaintiff's dismissal was the disagreement over fees and his maintenance of this lawsuit. We hold that the district court's legal conclusion that this entitled Buysse to recover is in error. *Cf. Becket v. Welton Becket & Associates*, 39 Cal.App.3d 815, 114 Cal.Rptr. 531 (1974) (an employee who is also a stockholder is not insulated against discharge from his employment where he has undertaken to file suit and litigate against the management of the employing entity). Without a finding of bad faith, an employee, employed under a contract terminable at will, may generally be discharged for any reason or no reason at all. *See Randolph v. New England Mu-*

---

3. *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383 (6th Cir. 1975); *Tahir Erk v. Glenn L. Martin Co.*, 116 F.2d 865 (4th Cir. 1941); *Gaines v. Monroe Calculating Mach. Co.*, 78 N.J.Super. 168, 188 A.2d 179 (1963). *Randolph* and *Gaines* were reversed by an appellate court after the trial court had granted a motion for summary judgment when the plaintiff adduced some evidence showing that his dismissal was in bad faith. *Tahir* likewise was reversed after the trial court granted a motion to dismiss when the plaintiff had alleged his dismissal was in bad faith.

4. Two cases relied upon by Buysse involved independent agents whose contracts required them to procure customers and the agents were to receive a commission from the business they procured for their principals. *Baum Associates, Inc. v. Society Brand Hat Co.*, 340 F.Supp. 1158 (E.D.Mo.1972), *aff'd*, 477 F.2d 255 (8th Cir. 1973); *Muller Enterprises, Inc. v. Samuel Gerber Advertising Agency, Inc.*, 182 Neb. 261, 153 N.W.2d 920 (1967). The status of an independent agent working under a brokerage contract terminable at will is entirely different than that of an employee as noted in *Baum*, 340 F.Supp. at 1161.

*tual Life Insurance Co.*, 526 F.2d 1383 (6th Cir. 1975). *See generally* Annot., 62 A.L. R.3d 271; 53 Am.Jur.2d *Master & Servant* § 43 (1970).

In addition, the contract here specifically provides that compensation is payable to the stockbroker only so long as he remains in the employ of PWJC. This express contract provision reinforces the position that Buysse cannot collect compensation for subsequent financings absent a showing of PWJC's bad faith. We conclude that Buysse was entitled to compensation only from the net management fees earned by PWJC on MHFA financings completed prior to the date of his termination on March 22, 1976.

 With respect to the question of how much compensation Buysse is entitled to after the initial financing and prior to his termination, the district court's analysis and definition of the terms "maximum compensation," "lesser compensation," and "little or no compensation" provide a useful guideline by which to measure Buysse's entitlement to compensation.[5] The court found:

> Where the stockbroker comes within the category of "lesser compensation," he would be entitled to 4–16% of the net management fee on subsequent financings. Where the stockbroker comes within the "little or no compensation" category, he would be entitled to 0–3% of the net management fee on subsequent financings.
>
> The court finds that plaintiff comes within the lower portion of the category of "lesser compensation." This finding is based on the following facts: (1) the MHFA was previously known to the Public Finance Department; (2) plaintiff did not have a close personal or business friendship with the decision-making officers of the MHFA; (3) plaintiff was not the effective cause of the MHFA business coming to Paine, Webber; (4) Paine, Webber already had a good entree to the MHFA; (5) plaintiff performed an effec-

tive introduction to another channel of the MHFA; and (6) plaintiff had no previous relationship with the MHFA or its important officers.

> The court concludes that plaintiff was entitled to 5% of the net management fees received by Paine, Webber, Jackson & Curtis on all subsequent MHFA financings. The Investment Banking Services Manual provides that the introducing stockbroker is entitled to compensation on all subsequent MHFA financings "so long as he remains in PWJC's employment." Pursuant to the court's finding that the principle reason for plaintiff's termination was his dispute over the compensation to which he was entitled, plaintiff is entitled to receive the 5% compensation on all MHFA financings through Paine, Webber, Jackson & Curtis until plaintiff reaches his statistical work expectancy of age 65.

*Buysse v. Paine, Webber, Jackson & Curtis, Inc.*, 4–76 Civ. 37 pp. 9–10 (D.Minn. April 26, 1979).

Based on the evidence relating to the quality of the introduction, we cannot say that the district court's findings are clearly erroneous. We hold that Buysse is entitled to 5% of the net management fees received by PWJC on those financings subsequent to the initial one on which he is entitled to 20%, but his entitlement to a percentage of those fees ceased when his employment was terminated.

Judgment reversed and remanded for entry in accord with our holding.

---

**5.** Though these terms are used by PWJC's Compensation to Stockbrokers Contract, they are not defined by that document nor is there

any indication that the company has defined them in any other manual.