Fred GUERCIO, Appellant,

v.

**PRODUCTION AUTOMATION CORPORATION, et al., Respondents.**

No. C1–02–2140.

Court of Appeals of Minnesota.

June 24, 2003.

Steve G. Heikens, Minneapolis, MN, for appellant.

Kerry L. Middleton, Erik F. Hansen, Fafinski, Mark & Johnson, P.A., Eden Prairie, MN, for respondents.

Considered and decided by ANDERSON, Presiding Judge, SCHUMACHER, Judge, and WILLIS, Judge.

## OPINION

G. BARRY ANDERSON, Judge.

In this employment dispute, appellant challenges summary judgment arguing that genuine issues of material fact exist indicating that (a) respondent Production Automation Corporation (PAC) breached its employment contract with appellant by lowering commission rates from 50% to 40%, (b) PAC breached its contract with appellant by failing to pay him commissions after his termination, (c) PAC breached implied and express covenants of good faith and fair dealing, (d) the statute of limitations does not bar appellant's claims, (e) PAC violated the Minnesota whistleblower statute by refusing to rehire appellant after he reported PAC to the Department of Health, and (f) respondent Jay Martin tortiously interfered with appellant's employment contract. We affirm in part, reverse in part, and remand.

## FACTS

On March 29, 1993, PAC hired appellant as a sales representative in its electronic-distribution business. At that time, PAC was owned by Tom Martin and had only two sales representatives. Appellant prepared a letter agreement dated April 7, 1993, ultimately signed by Tom Martin that outlined the details of appellant's employment agreement with PAC. The letter agreement provided that appellant would receive a salary of $3,500 per month until "sales have grown and sustained sales levels such that commissions * * * exceed salary." At that point, appellant would receive a commission of 50% of the profit from sales that he made and no longer receive a monthly salary.[1] Appellant moved to commission-based compensation after working for approximately six to eight months.

On April 26, 1993, appellant signed a second agreement with PAC that contained a non-compete clause. The document also included a provision that stated that appellant would not be paid commissions for amounts PAC received after his termination. This document did not recite any consideration for the new terms of appellant's employment.

In early 1998, respondents Jay Martin and Steve Block purchased PAC from Tom Martin. The new owners decided to change the compensation structure for all sales representatives, including appellant. Under the revised compensation plan, all salespersons received a 40% commission on certain PAC items, rather than the previously paid 50%. In addition, sales of certain lines of products for which commissions were not previously paid would now result in commissions of 10% to 15%.

Throughout his employment at PAC, appellant kept a database of his client contacts on his home computer. Appellant testified that the database included both his contacts developed while working for PAC and also prospective customers that he had identified from past employment. Starting in approximately 1996 or 1997,

---

1. The district court apparently mistakenly believed that appellant would continue to receive both his salary and a commission after transitioning to commission-based compensation. This is directly refuted by both parties' briefs.

PAC began requesting that appellant turn over this database. After the ownership changed hands in 1998, Jay Martin repeatedly demanded that appellant turn over the database, claiming that it was PAC's property. Appellant disagreed and refused to turn it over. Finally, on July 29, 1998, appellant's employment with PAC was terminated. Appellant testified that Jay Martin said to him, "If you give us the database, we'll hire you back on the spot. But you are simply terminated." A few weeks later, while retrieving his personal effects from his office, appellant discussed his employment situation with Jay Martin and turned over the database. Nevertheless, PAC refused to rehire appellant.

In mid-July of 1998, appellant filed an anonymous complaint with the Minnesota Department of Health reporting that PAC permitted smoking in the workplace. The department, by letter dated July 31, 1998, notified the company of violations of state law. PAC, therefore, received notice of the anonymous complaint between the time appellant was terminated and PAC's refusal to rehire him a few weeks later. Appellant believes that PAC refused to rehire him because appellant reported PAC's state-law violations.

Appellant brought the present suit against PAC and its co-owners, alleging numerous causes of action. The district court entered summary judgment in favor of respondents on all issues on January 2, 2002, and this appeal followed.

## ISSUE

Did the district court properly enter summary judgment in favor of respondents?

## ANALYSIS

■ On an appeal from summary judgment, we ask two questions: (1)

whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990).

> A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted.

*Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). A genuine issue of material fact exists when the nonmoving party presents evidence that creates a doubt as to a factual issue that is "probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn.1997).

### A. Reduction of commissions from 50% to 40%

■ Appellant first argues that as a matter of law PAC breached its employment contract with him by reducing appellant's commissions from 50% to 40%. The district court held that because appellant was an at-will employee, PAC could modify appellant's compensation at any time.

It is undisputed that appellant's employment with PAC was an at-will relationship. Appellant correctly argues that his status as an at-will employee does not, by itself, allow PAC to unilaterally change the terms of his employment. But this is not what happened. By letter, PAC initiated the change in some sales commissions from 50% to 40%. This constitutes an offer to change the terms of the existing employ-

ment agreement. *See Stream v. Cont'l Mach., Inc.,* 261 Minn. 289, 293, 111 N.W.2d 785, 788 (1961) (holding that "[w]here an employee accepts or retains employment with knowledge of new or changed terms or conditions, a contract results embodying the new or changed terms or conditions.").

Appellant's continued employment as a sales representative after PAC announced the change in his commissions constitutes acceptance of the offer of a unilateral contract. *Id.* By staying on the job when he was free to leave, appellant supplied "the necessary consideration for the offer." *Id.; see also Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983) (holding that when the employee "retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation"). Because appellant implicitly consented to the change in the terms of his employment contract, his assertion that PAC breached its contract as to this issue is without merit.

### B. Payment of commissions after appellant's termination

Appellant next maintains that PAC breached its contract with him by failing to pay commissions on sales made by appellant that were outstanding when PAC terminated appellant's employment. The district court relied on the April 26, 1993, letter, signed by appellant, to conclude that PAC did not breach any contract with appellant. After a non-compete provision, that letter provides:

> I understand that in return for receiving a wage in excess of my earned commissions for a limited period of time at the commencement of my employment, I will receive no commissions for amounts received by PAC after the termination of my employment.

This language contemplated that because the $3,500 monthly salary paid to appellant during his first few months would be more than the commissions he earned during that time (while he was establishing a client base), PAC would not compensate him for amounts PAC received on appellant's sales after his termination.

Appellant contends that the document should be strictly analyzed under law addressing the applicability of non-compete agreements, which requires independent consideration for such an agreement to be enforceable. *See Nat'l Recruiters, Inc. v. Cashman,* 323 N.W.2d 736, 740 (Minn. 1982) (holding that when a restraint of trade covenant is not ancillary to the initial "employment contract, it can be sustained only if supported by independent consideration"). Appellant contends that because there was no independent consideration, the unilateral change precluding the payment of commissions after his employment with PAC ended was invalid. The district court did not address whether it analyzed the April 26 letter under non-compete law or general contract principles. The district court merely stated that appellant had clearly assented to the changed term and that there was no reason to disregard the valid contract.

Although PAC does not concede that independent consideration was lacking here, it argues that the court should sever the non-compete from the commission-payment term and interpret the provisions separately. If these provisions are divisible, PAC maintains, the finding of independent consideration is not necessary to enforce the commissions clause.[2]

---

2. The blue-pencil doctrine allows a court that determines that a non-compete agreement is overly broad or unreasonable to modify the contract to fit the law. *Hilligoss v. Cargill,*

■ If part of an agreement is unenforceable, a court may enforce the rest of the agreement

> in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.

Restatement (Second) of Contracts § 184(1) (1981). Moreover, entire contract provisions or terms within a particular provision can be severed if the party seeking to enforce the term or provision obtained it in good faith and in accordance with reasonable standards of fair dealing. *Id.* at § 184(2).

Although Minnesota courts have not construed Restatement (Second) of Contracts § 184, the supreme court has held that the intent of the parties must be ascertained in determining whether contract provisions are severable. *Nat'l Farmers Union Prop. & Cas. Co. v. Anderson,* 372 N.W.2d 71, 75 (Minn.App. 1985). Moreover, though addressing concerns outside of the severability issue, this court has stated that the judge's role in ascertaining the intention of the parties is as follows:

> If the language of a contract is ambiguous, resort may be had to extrinsic evidence in aid of construction. If the extrinsic evidence is conclusive and undisputed, the determination of the meaning of a contract is a function of the trial judge, but if the extrinsic evidence is inconclusive or disputed, the uncertainty and conflict must be resolved at trial.

*Inc.,* 649 N.W.2d 142, 147 n. 8 (Minn.2002); *Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 131 n. 1 (Minn.1980). The justification for this judicial rule is that "a court is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties." *Bess v. Bothman,* 257

*Deutz & Crow Co., Inc. v. Anderson,* 354 N.W.2d 482, 486 (Minn.App.1984).

Outside of Minnesota, there is authority indicating that, in deciding whether a contract is severable, the court should determine if the unenforceable section of the contract was so central to the agreement that the parties would not have agreed absent that provision. *Hargrave v. Canadian Valley Elec. Coop., Inc.,* 792 P.2d 50, 60 (Okla.1990). If the unenforceable clause is not essential to the agreement, "the offending provision will be excised and the remaining portions of the contract will be enforced." *Id; see also Holloway v. Faw, Casson & Co.,* 319 Md. 324, 572 A.2d 510, 518 (1990) (citing the Restatement (Second) of Contracts § 184 and holding that a post-termination payment clause was a separate, free-standing remedy and thus "severable in the classic sense").

■ On these undisputed facts, we hold as a matter of law that the parties did not intend for the non-compete clause in the April 26 agreement to be severed from the commission clause. First, the contract does not contain a severability clause and nothing within the four corners of the document indicates that the two provisions should be interpreted separately. Second, under the Restatement and *Hargrave,* although respondents did not attempt to enforce the non-compete agreement, they have the burden, for summary-judgment purposes, of showing that it was not critical to the agreement. Respondents have not sustained this burden.

N.W.2d 791, 794 (Minn.1977) (citing 6A Corbin, Contracts, § 1390). Because the blue-pencil rule is invoked when a court reshapes an unreasonable clause, it is not applicable here. The district court did not modify the April 26 letter; it merely gave effect to that contract as it interpreted it.

The non-compete provision is placed earlier in the agreement and there is little doubt that this clause was an important term in the April 26 document. Concluding that one of the two terms is important to the agreement of the parties is not the same as concluding that the remaining term is unimportant. The employer drafted this document. The employer chose to include terms it thought were significant to the agreement and insisted on execution of the agreement by appellant. Appellant argues persuasively that he regarded both terms as significant and other than denying these assertions, respondents offer no evidence to show otherwise. Perhaps a finder of fact, hearing all of the evidence, will conclude differently. But for summary-judgment purposes and based on the record before this court, we can only conclude that both terms were essential to the agreement.

■ Because we hold that the commission terms as a matter of law and based on undisputed facts are not severable, we must now determine whether independent consideration exists to support the entire April 26 agreement. Independent consideration must exist to support a non-compete entered into after the original employment contract. *Nat'l Recruiters*, 323 N.W.2d at 740. PAC claims that appellant's transition from part-time to full-time employment was contingent on his execution of the April 26 agreement and therefore provides the necessary independent consideration. It appears that appellant did make a transition to full-time employment at approximately the time he signed this agreement. But it is unclear from his deposition testimony whether full-time employment was contingent on signing this agreement or even if that employment was related to the agreement. Appellant's testimony is as follows:

A. I felt if I didn't sign it, I would be fired.

Q. (respondent's counsel): And that was before you went full time?

A. That was after I started working. Yes.

Q. But it was before you went full time, right?

A. I was working on a partial basis. Yes.

Q. And when you say "partial basis," I think earlier we were able to agree that you mean part time by that?

A. It was about 60 hours.

Q. Over what period of time? 60 hours a week?

A. It was 60 hours worth of work before I signed the noncompete.

Appellant also later admitted that he worked approximately 60 hours during the month of April. Respondent's counsel clarified this point by asking:

Q. And at the time you signed [the April 26 agreement], you still were working on a part-time basis for PAC, right?

A. Yes

The questioning here does not indicate when appellant began working a regular 40–hour workweek or whether the transition to full-time employment was contingent on signing the April 26 document. Further, a review of the deposition excerpts of Steve Block and Jay Martin reveals only a cursory discussion of appellant's non-compete agreement; for example, the testimony indicated that the former owner, Tom Martin, required that all employees sign a non-compete. Neither of these depositions provides any certainty as to whether appellant transferred to full-time work as a result of signing this agreement. Finally, nothing in the April 7 agreement, which addressed the general terms of appellant's

employment with PAC, mentions working part-time. Nor does the April 26 agreement recite consideration in any form, including a transition to full-time employment.

██ Whether independent consideration existed to support the parties' April 26 agreement is a material fact issue that is very much in dispute. Accordingly, we reverse the district court on this issue and remand for trial on the issue of whether PAC breached its employment agreement with appellant by failing to pay commission amounts to him after his termination. Because our disposition of this issue renders moot many of appellant's other allegations of error, we do not address whether the April 26 agreement is ambiguous, whether the equities favor payment of post-termination commissions to appellant, or whether the doctrine of procuring cause is applicable here.[3]

## C. Breach of implied covenant of good faith and fair dealing

██ In count two of his complaint, appellant alleges that an implied covenant of good faith and fair dealing was created by PAC's various actions, including inducing appellant to turn over his database on the promise he would be rehired. The district court held that there is not a separate cause of action for the breach of the covenant of good faith and fair dealing under these facts, and we affirm that holding.

Appellant's reliance on this doctrine is misplaced for a variety of reasons. First, appellant's argument that Minnesota reads into all contracts an implied term of good faith is erroneous. *Eklund v. Vincent Brass and Alum. Co.*, 351 N.W.2d 371, 378 (Minn.App.1984). Minnesota law has not read an implied covenant of good faith and fair dealing into employment contracts when considering a termination. *Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn.1986). *Hunt* also observed that our "sister jurisdictions" have also rejected a covenant to terminate only in good faith. *Id.* at 858. No such covenant in the context of this case exists and appellant's argument fails.

## D. Statute of Limitations

██ Under Minn.Stat. § 541.07(5) (2002), actions to recover wages, including commissions, must be commenced within two years. PAC argues that appellant's assertion that PAC breached its employment contract by changing his commission plan is barred by the two-year statute of limitations.

██ A breach-of-contract cause of action accrues generally at the time of the breach, even if the damages do not manifest themselves until later. *Estate of Riedel by Mirick v. Life Care Ret. Cmtys., Inc.*, 505 N.W.2d 78, 81 (Minn.App.1993). But under Minnesota law, a contractual cause of action for lost wages arises each time a payment is due, but is not paid. *McGoldrick v. DataTrak Intern., Inc.*, 42 F.Supp.2d 893, 898 (D.Minn.1999).

██ Appellant argues that each payment that PAC failed to make to him

---

**3.** We also note that although the parties did not cite the case of *Lapadat v. Clapp–Thomssen Co.*, 397 N.W.2d 606 (Minn.App.1986), it arguably supports the nonpayment of commissions to appellant. In *Lapadat*, this court held that "[a] party to an agreement terminable at will is not entitled to payment of commissions after the employment is terminated." *Id.* at 609 (citing *Buysse v. Paine, Webber,*

*Jackson & Curtis, Inc.*, 623 F.2d 1244, 1249–50 (8th Cir.1980) (applying Minnesota law)). But *Buysse* addressed the different issue of terminating an at-will employee and did not make a statement of law relating to commission payments found anywhere else in Minnesota law. *Buysse*, 623 F.2d at 1249–50. We therefore do not find it controlling authority.

under the old compensation plan constituted a separate breach of contract, and, thus, a new statute of limitations began for each payment. We view appellant's cause of action relating to the commission changes as a lost-wages suit, and thus at least part of his claim is not time barred. Because PAC made its last payment to appellant on August 8, 1999, the suit was timely as to payments that appellant alleges should have been paid to him during the two years prior to the commencement of appellant's suit.

### E. Whistleblower claim

The Minnesota whistleblower act protects an employee who reports, in good faith, "a violation or suspected violation of any federal or state law * * * to an employer or any governmental body or law enforcement official." Minn.Stat. § 181.932, subd. 1(a) (2002).

> To establish a prima facie case of retaliatory discharge, an employee must show: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two.

*Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn.App.2001) (quotation omitted), *review denied* (Minn. May 15, 2001).

Appellant admits that the alleged adverse employment action by PAC—refusing to rehire appellant after he turned over the customer database—occurred after he was terminated and was, therefore, no longer an employee. Finding that the whistleblower act's language refers only to current employees and not to former employees, the district court granted summary judgment for respondents on this claim.

Appellant points to federal case law construing Title VII of the Civil Rights Act of 1964 as support for his assertion that former employees should also be within the protections of the Minnesota whistleblower statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Section 704(a) of Title VII makes it unlawful "for any employer to discriminate against any of its employees or applicants for employment" who have availed themselves of Title VII protections or assisted others to do so. *Id.* at 339, 117 S.Ct. at 845 (quoting 78 Stat. 257, as amended, 42 U.S.C. § 2000e–3(a)). The Supreme Court determined that the use of the term "employees" was ambiguous when read in the context of other Title VII provisions that use the term to mean something more than "current employees." *Id.* at 342–43, 117 S.Ct. at 847. Because the term "employee" was not always used to exclude former employees, the court concluded that the term standing alone is "necessarily ambiguous and each section must be analyzed to determine whether the context gives the term a further meaning." *Id.* at 343–44, 117 S.Ct. at 847. Examining the term "employees" in § 704(a), the court held that the primary purpose of that section and the "broader context of Title VII" established that former employees are covered. *Id.* at 346, 117 S.Ct. at 849.

*Robinson*, however, addressed federal law analyzing Title VII claims and not Minnesota law interpreting the *Minnesota* whistleblower act. In addition, even were we to adopt *Robinson* as controlling here, appellant has not pointed to other sections in the whistleblower act that use the term "employee" to refer to both current and former employees. Since the whistleblower act does not employ the term "employee" in that manner, the statute is not ambiguous in the way *Robinson* declared Title VII was. Indeed, Minnesota law defines "employee" as "a person who performs services for hire in Minnesota for an employer." Minn.Stat. § 181.931, subd. 2

(2002). Because appellant cannot show ambiguity, the whistleblower act only applies to current employees, and the claim concerning this issue was properly dismissed. *See Robinson,* 519 U.S. at 341, 117 S.Ct. at 846 (holding that at "first blush" and without further statutory ambiguity, "employees" would seem "to refer to those having an existing employment relationship with the employer in question."). Because we conclude that the Minnesota whistleblower act does not protect former employees, we need not consider whether appellant proved the other elements to establish a prima-facie violation of the act.[4]

### F. Tortious interference with contract

 Lastly, appellant contends that the district court erred in dismissing his claim against respondent Jay Martin for tortious interference with contract. Appellant is correct that an at-will employee may maintain a cause of action for tortious interference with contract. *Nordling v. N. States Power Co.,* 478 N.W.2d 498, 505 (Minn.1991). Tortious interference requires:

> (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom.

*Bouten v. Richard Miller Homes, Inc.,* 321 N.W.2d 895, 900 (Minn.1982).

 A corporate officer or manager, however, has a qualified privilege to interfere with contracts between the corporate entity and its employees. *Nordling,* 478 N.W.2d at 505. In such cases, if an employee is terminated by the corporate officer, "the actions are those of the corporation" and the employee's complaint is properly lodged against the company for breach of contract, not against the agent used to carry out the corporation's action. *Id.* The justification for such a rule is that

> [t]o allow the officer or agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation.

*Id.* at 505–06. The supreme court has recognized, however, that a corporate officer or agent can be liable for interference with contract if he or she acts outside the scope of his or her duties. *Id.* at 506. If the corporate officer's actions are motivated primarily by actual malice, i.e., "bad faith, * * * personal ill-will, spite, hostility, or a deliberate intent to harm" the employee, the officer's privilege from liability will be lost. *Id.* at 507.

To establish actual malice, appellant points to, *inter alia,* Jay Martin's continued attempts to obtain appellant's customer database, Jay Martin's promise to rehire appellant if he gave PAC the database and Jay Martin's subsequent failure to do so, and the reduction in appellant's commission rates. The district court rejected appellant's arguments and concluded that there was no genuine issue of material fact to overcome Jay Martin's privilege. The court held that there was no showing of how the commission change, which affected all sales personnel, was directed at appellant or how Jay Martin acted with malice by attempting to obtain the database.

We affirm the district court's conclusions because, on the record before us,

---

4. Appellant's argument that the temporal proximity of a suspicious series of events can be a factor to consider in determining whether his complaint motivated the adverse employment decision not to rehire him is accu-

rate. *Stever v. Indep. Sch. Dist. No. 625, St. Paul,* 943 F.2d 845, 852 (8th Cir.1991). But this does not change his status as a former employee, and thus he is outside the protections of Minn.Stat. § 181.932.

there is no showing that Jay Martin acted with actual malice toward appellant. The attempts to obtain the database from appellant were acts done to benefit PAC's overall business fortunes. Likewise, there was no showing that the change in commission rates was motivated by Jay Martin's personal animosity toward appellant.

## DECISION

We affirm the district court on all issues except the question of whether appellant is owed any commissions on sales that were outstanding when PAC terminated appellant's employment. For summary-judgment purposes, the April 26 agreement as a matter of law is not severable and there are genuine issues of material fact as to whether independent consideration existed to support this agreement. Accordingly, we remand to the district court to determine whether appellant is owed commission amounts and whether independent consideration exists to make the commission-payment provision in the April 26 agreement enforceable.

**Affirmed in part, reversed in part, and remanded.**