2012 ND 21

**Barry MYAER, Plaintiff and Appellee,**

v.

**NODAK MUTUAL INSURANCE COMPANY, Defendant and Appellant.**

**No. 20110153.**

Supreme Court of North Dakota.

Feb. 10, 2012.

Amy Marie Oster (argued) and Gary R. Wolberg (appeared), Bismarck, N.D., for plaintiff and appellee.

Sarah Andrews Herman (argued) and Matthew Allen Kipp (on brief), Fargo, N.D., for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Nodak Mutual Insurance Company appealed from a judgment awarding Barry Myaer $34,933.24 plus interest in his breach of contract action against Nodak. We conclude the district court did not err in ruling Myaer was entitled to deferred commissions payable to him in December 2009, but did err in ruling those commissions could exceed 10 percent under the terms of the parties' contract. We affirm in part, reverse in part, and remand for further proceedings.

I

[¶ 2] On July 7, 2009, Nodak terminated Myaer's "Career Producer's Contract" after he had served as a captive insurance agent for the company in Mohall for almost 29 years. The most recent Career Producer's Contract Myaer signed was dated December 28, 2004, but Nodak had subsequently sent similar contracts throughout the years, the last of which was effective January 1, 2009. The contract provided different commission calculations depending on the type of policy written by Myaer. The contract provided for a 10 percent commission on gross premiums for sales of multi-peril crop insurance ("MPCI").

[¶ 3] The premium payments for MPCI policies were normally paid in two installments by the policyholders. An addendum to the contract provided:

A. Career Producer will receive 50% of the commissions payable in the month following those policies processed by AFBIS.

B. Career Producer will receive balance of commissions due on those policies that are paid in full in the month following processed premium.

According to Myaer, the first installment was paid in August after acreage reports were submitted and the second installment was paid in December after policyholders paid their premiums in full. The contract addendum also provided for reductions of the 10 percent commission under certain circumstances:

C. A commission reduction of 1% will be applied to all gross premiums if all submissions and loss reports are not submitted on-line.

D. A commission reduction of 1% will be applied to all gross premiums if all MPCI notes including any outstanding interest are not paid and received in the home office prior to November 1st.

[¶ 4] The contract also explained when commissions were "earned":

COMMISSIONS, CREDITS, AND REFUNDS. Commissions on any policy or on added coverage shall be earned when: (1) the policy or added coverage has been accepted by the Company or the other insurers identified in the Addendums to this Contract; (2) the policy is issued; and (3) premium is received and processed by the Company.

The contract provided that it "may be canceled by either party, with or without cause, at any time upon giving notice, in writing, to the other party," and further provided: "Upon cancellation of this Con-

tract, no further commission or premium credit shall accrue."

[¶ 5] After Myaer's termination in July 2009, Nodak paid him $20,338.72 in August 2009 for commissions owed to him. Myaer's "MPCI Commission Statement" for the 2009 crop year indicated $22,500.45 in deferred commissions remained to be paid. However, in December 2009, Nodak did not pay Myaer the deferred commissions on the policies he had sold, claiming he was no longer entitled to them. Nodak claimed Myaer was not entitled to further commissions because his contract was terminated before policyholders had paid the second installments on their premiums.

[¶ 6] In April 2010, Myaer brought this action against Nodak claiming, among other theories not relevant to the appeal, that it had breached the Career Producer's Contract by failing to pay him the deferred commissions in December 2009. Both parties moved for summary judgment. Myaer filed an affidavit setting forth his calculations of what he was owed and claiming, "[t]he way MPCI commissions were typically paid, if I did my reports via the Internet and all farmers' notes were paid, my total commission would be 12 per cent. . . ." Nodak presented a copy of the Career Producer's Contract, and filed a "Motion in Limine to Exclude Testimony Contrary to Career Producer's Contract." Nodak argued Myaer's claim to a 12 percent commission was barred by the parol evidence rule because it conflicted with the express terms of the 2009 contract, which provided for a maximum 10 percent commission.

[¶ 7] The district court granted summary judgment in favor of Myaer, but did not address Nodak's motion in limine. The court ruled that, under the terms of the contract, Myaer's right to receive the second installment of commissions had already "accrued" at the time Nodak termi-

nated the contract. The court awarded him a 10 percent commission on the policies he had sold in the amount of $22,500.45 and also awarded him a "bonus" in the amount of $9,003.70 in accordance with Myaer's calculations, reasoning "it does not appear that Nodak has actually challenged the work product of Mr. Myaer." Myaer was also awarded pre- and post-judgment interest.

## II

[¶ 8] Nodak argues the district court erred in concluding Myaer is entitled to the deferred commissions payable in December 2009 because the ruling ignores the plain language of the Career Producer's Contract.

[¶ 9] The standard for reviewing a summary judgment is well-established:

"Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court

properly granted summary judgment is a question of law which we review de novo on the entire record."

*Riverwood Commercial Park, LLC v. Standard Oil Co., Inc.*, 2011 ND 95, ¶ 6, 797 N.W.2d 770 (quoting *Missouri Breaks, LLC v. Burns*, 2010 ND 221, ¶ 8, 791 N.W.2d 33).

[¶ 10] Generally, the interpretation of a written contract is a question of law for the court, making summary judgment an appropriate method of disposition in contract disputes. *See Tri–State Ins. Co. v. Commercial Grp. W., LLC*, 2005 ND 114, ¶ 10, 698 N.W.2d 483; *Garofalo v. Saint Joseph's Hosp.*, 2000 ND 149, ¶ 7, 615 N.W.2d 160. We construe written contracts to give effect to the parties' mutual intention when the contract was formed, and if possible, we look to the writing alone to determine the parties' intent. *See Doeden v. Stubstad*, 2008 ND 165, ¶ 14, 755 N.W.2d 859; N.D.C.C. § 9–07–03. Words in a contract are construed in their ordinary and popular sense, unless they are used by the parties in a technical sense, or unless a special meaning is given to them by usage. *See Riverwood Commercial Park, LLC*, 2011 ND 95, ¶ 7, 797 N.W.2d 770; N.D.C.C. § 9–07–09. Under N.D.C.C. § 9–07–10, "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." We may look to principles of the applicable law at issue to see whether an undefined term has a technical meaning. *See Hanneman v. Continental W. Ins. Co.*, 1998 ND 46, ¶ 29, 575 N.W.2d 445. Although extrinsic evidence is not admissible to contradict unambiguous written contract language, extrinsic evidence may be considered to show the parties' intent if the contract is ambiguous. *See Kuperus v. Willson*, 2006 ND 12, ¶ 11, 709 N.W.2d 726. Whether a contract is ambiguous is a question of law. *Id.* We independently examine and construe a contract to determine if the district court erred in its interpretation. *See Irish Oil and Gas, Inc. v. Riemer*, 2011 ND 22, ¶ 11, 794 N.W.2d 715.

[¶ 11] We have recognized that "one working on commission may not be entitled to commissions made before termination if the contract so provides." *Garofalo*, 2000 ND 149, ¶ 14, 615 N.W.2d 160. Nodak argues this is the situation here based on the plain language of the parties' contract. According to Nodak, one of the conditions precedent for Myaer to "earn[ ]" a commission is that the "premium is received and processed by the Company," and the second installment of the premiums upon which the deferred commissions payable in December 2009 were based had not been received and processed by Nodak at the time of Myaer's July 2009 termination. Therefore, Nodak argues, the December 2009 deferred commissions had not yet "accrue[d]" when Myaer was terminated and he is not entitled to those commissions. Nodak contends this case is similar to *Johnson v. Peterbilt of Fargo, Inc.*, 438 N.W.2d 162, 163 (N.D.1989), in which a majority of this Court held a contractual provision stating no commission will be paid to a salesman where the item sold is not delivered until after the salesman's termination from employment was not void as against public policy. The employment contract in *Johnson* specifically provided that " 'COMMISSIONS WILL NOT BE PAID TO SALESMEN ... ON SALES WHERE THE UNIT OR UNITS ORDERED IS DELIVERED AFTER THE TERMINATION OF SALESMAN'S EMPLOYMENT,' " and the employee quit his job before two trucks he had sold were delivered. *Id.* In this case, the right to commissions after termination of the parties' contract is not

clearly defined as it was in *Johnson.* Myaer's right to the deferred commissions depends on when they "accrue[d]."

[¶ 12] Nodak relies on a dictionary definition of the word "accrue" to ascertain its "plain meaning." The word "accrue" has been defined as: "to come into existence as an enforceable claim." *Webster's Third New International Dictionary* 13 (1971); *see also Larson v. Norkot Mfg., Inc.,* 2002 ND 175, ¶ 10, 653 N.W.2d 33 (indicating a claim for relief accrues when all of the necessary elements of the claim have occurred). However, the word "accrue" has also been defined as: "to come by way of increase or addition." *Webster's Third New International Dictionary* 13 (1971). Myaer essentially argued, and the district court agreed, that in the context of employment contract provisions governing the payment of insurance commissions, the word "accrue" is a technical term that has acquired the latter definition quoted above.

[¶ 13] The district court focused on the contract provision stating, "[u]pon cancellation of this Contract, no further commission or premium credit shall accrue," and relied on 4 Lee R. Russ, Thomas F. Segalla, *Couch on Insurance* § 57:55, at p. 57–107 (3d ed.2005) (footnote omitted), in which the authors state:

> [U]nder an agency contract provision that an agent's interest in premiums to "accrue" on business secured is to cease on termination of his or her employment, "accrue" means grow, increase, or augment, and does not apply to the unpaid portion of a premium on a policy in force at the time his or her contract was terminated, although the contrary would be true as to future renewal premiums.

[¶ 14] The relevant case cited by the authors for this proposition is *American Sur. Co. v. Sheerin,* 203 S.W. 1120 (Tex.Ct. Civ.App.1918). In *Sheerin,* an insurance broker procured for the company an application for a bond for two years on the condition that he receive 20 percent of the premium. *Id.* at 1121. One half of the premium was payable during the first year and the other half was payable during the second year. *Id.* After the first payment was made, the local agent for the company was changed. *Id.* The issue involved who was entitled to the commission on the second half of the premium:

> The American Surety Company and its local agent agreed to the conditions, and the bond was issued through the local agency, was delivered to the bank, which, according to the arrangement, paid the one-half of the premium then due, and a year subsequently the other half. It is thus obvious that Sheerin had concluded every essential step necessary to entitle him to his compensation under his arrangement with American Surety Company. The fact that the company extended credit to the bank did not reduce the period of the bond to any less term than two years, or lessen the liability of the bank to pay the premium when due, or require any other act on the part of Sheerin in order to earn his commission. The transaction was completed and all parties bound. It is not uncommon for insurance companies to extend credit in payment of premiums, and when proven such extensions are held to be a waiver of policy provisions requiring actual payment in order to create liability. Had the bank failed to pay the premium when it matured, it may be that the American Surety Company would not have been bound to Sheerin; but since the bank did pay it, and since Sheerin secured the business, we see no reason why he is not entitled to the fruits of his labor.

Counsel for defendant in error argue, however, that since Sheerin's commission was a portion of that allotted to

Matthews, the local agent, at the time the bond was written, Sheerin's right to the commission is no greater than the former's, and that under Matthews' contract he had no interest in the commission when the last installment was paid. Matthews ceased to be the agent of the American Surety Company about May 1, 1915. The second installment on the premium matured in the following November. Matthews' contract provided that, "in the event of this agreement being terminated by any cause, all the interest of the agent in any future premium or premiums that may accrue on the business secured hereunder shall cease and determine at the date of such termination." Obviously, the unpaid portion of the premium on the bond executed and in force was not a premium which might "accrue" on the same bond in the future. "Accrue" means to grow, increase, augment, additional. Hence the provision has reference to premiums to accrue in the future as distinguished from those which have accrued, as we hold the premium in controversy did when the bond was written under the circumstances stated.

*Id.* at 1122.

[¶ 15] Nodak argues *Sheerin* is distinguishable because the only condition precedent to "earn" the second installment of the commission was for the agent to "secure[ ] the business." 203 S.W. at 1121. Nodak contends that, unlike the situation in *Sheerin*, Myaer's commissions were not "earned" under his contract until the premiums were paid by the policyholders and processed by the company. We see more similarities than dissimilarities between *Sheerin* and this case. As in *Sheerin*, payment of the second installment of the premiums was an act to be performed by the policyholders, not by Myaer. The court in *Sheerin* recognized that the agent would not have been entitled to the second

installment of the commission if the second premium had not been paid, just as the contract provisions governing when a commission is "earned" direct in this case. *Id.* at 1122. Myaer had completed all of the actions on his part necessary to entitle him to the commissions, and if the policyholders paid the second installment of premiums, under *Sheerin* Myaer was entitled to the deferred commissions on those premiums.

[¶ 16] Nodak seeks to equate the term "accrue" with the contract provision stating that a commission is "earned" when the "premium is received and processed by the Company." However, the terms "earned" and "accrue" are not synonymous in this context. In the area of insurance policy commissions, the term "accrue" has acquired a technical meaning to "grow, increase, or augment, and does not apply to the unpaid portion of a premium on a policy in force at the time [the agent's] contract was terminated." 4 *Couch on Insurance, supra.* Nodak could have specified in the employment contract that commissions would not be "earned," rather than "accrue," after termination of employment. It did not do so.

[¶ 17] Considering the technical meaning given to the term "accrue" in this context, we agree with the district court that, as a matter of law, Myaer is entitled to the deferred commissions.

### III

[¶ 18] Nodak argues the district court erred in awarding Myaer a 12 percent commission because the parties' contract expressly limited his commission to 10 percent.

[¶ 19] We reject Myaer's contention that Nodak failed to preserve this issue for appeal. Not only was the Career Producer's Contract before the district

court, but Nodak filed a "Brief in Support of Motion in Limine to Exclude Testimony Contrary to Career Producer's Contract" on March 3, 2011, almost one week before the court issued the summary judgment ruling. In its brief, Nodak relied on the parol evidence rule and argued Myaer "has attempted to inflate the amount of the additional commission he believes is owed to him by inventing commission bonus provisions that do not exist." Nodak pointed out the contract provisions limiting commissions to 10 percent and providing only for reductions of one percent if submissions were not submitted online and one percent if notes were not paid in full. The court's observation "it does not appear that Nodak has actually challenged the work product of Mr. Myaer" is incorrect. Nodak raised the issue in the district court.

 [¶ 20] The parol evidence rule is a rule of substantive law and precludes use of evidence of prior oral negotiations and agreements to vary the terms expressed in a written contract. *See Citizens State Bank–Midwest v. Symington,* 2010 ND 56, ¶ 19, 780 N.W.2d 676; *Des Lacs Valley Land Corp. v. Herzig,* 2001 ND 17, ¶ 7, 621 N.W.2d 860. The parol evidence rule is codified in N.D.C.C. § 9-06-07, which provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supercedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." A court may consider parol evidence when a written agreement is ambiguous, or when the written agreement does not reflect the parties' intent because of fraud, mistake, or accident. *Symington,* at ¶ 20. However, "[p]arol evidence cannot vary or contradict the terms of a complete, written contract adopted as a definite expression of the parties' agreement."

*Jorgensen v. Crow,* 466 N.W.2d 120, 123 (N.D.1991). A decision to admit parol evidence is a question of law, fully reviewable on appeal. *Symington,* at ¶ 20.

 [¶ 21] In his affidavit, Myaer stated "[t]he way MPCI commissions were typically paid, if I did my reports via the Internet and all farmers' notes were paid, my total commission would be 12 percent." Myaer claimed the 2004 contract entitled him to a one percent bonus if all information was submitted "via the Internet" and an additional one percent if "all notes are paid by the policyholders." Although an addendum to the 2004 contract allowed a one percent bonus for MPCI notes paid and received by a certain date, the contract does not mention any bonus for submission of information "via the Internet." The 2004 contract may have included a one percent commission incentive to encourage the agents to submit their information on line. But it is clear from the current contract that by 2009, when the use of computers had become more customary, that Nodak adopted a penalty provision for failure to submit information on line rather than an increase in commission as an incentive to do so. In any event, the 2004 contract allowed Nodak to "modify rates for renewals or any bonuses that might apply," and Nodak did so by 2009. Although Myaer points out that he did not sign the 2009 employment contract, he admitted "[t]his agreement was sent to me by email." In *Sadler v. Basin Elec. Power Coop.,* 431 N.W.2d 296, 298 (N.D.1988), we said:

> "In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent

unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." *Pine River [State Bank v. Mettille]*, 333 N.W.2d [622, 627 (Minn. 1983) ], citing *Stream v. Continental Machines, Inc.*, 261 Minn. 289, 293, 111 N.W.2d 785, 788 (1961).

Although Myaer was labeled in the agreement as an "independent contractor" rather than an at-will employee, which necessitates application of general rules of contract interpretation rather than principles applicable in a typical employer-employee relationship, *see Huber v. Farmers Union Serv. Ass'n*, 2010 ND 151, ¶ 21, 787 N.W.2d 268, the concept of unilateral contracts is a contract principle which applies to contracts between employers and independent contractors. *See Ford v. American Express Fin. Advisors, Inc.*, 98 P.3d 15, 19–20 (Utah 2004). By continuing his employment as a career producer with knowledge of the changed commission provisions, Myaer accepted Nodak's offer of a unilateral contract. *See, e.g., Guercio v. Production Automation Corp.*, 664 N.W.2d 379, 383–84 (Minn.Ct.App. 2003). The provisions of the 2009 contract govern in this case.

[¶ 22] The 2009 contract provided for a 10 percent commission which only allowed for a reduction of one percent if submissions were not submitted online and a reduction of one percent if MPCI notes were not paid and received by a certain date. Myaer's contrary affidavit testimony about how "commissions were typically paid" "on its face violates the parol evidence rule." *Alerus Fin., N.A. v. The Marcil Grp. Inc.*, 2011 ND 205, ¶ 30, 806 N.W.2d 160.

[¶ 23] We conclude the district court erred as a matter of law in holding Myaer is entitled to more than a 10 percent commission.

IV

[¶ 24] We affirm the district court's ruling that Myaer was entitled to the deferred commissions, but reverse the court's ruling that those commissions could exceed 10 percent. We remand for recalculation of the proper amount of Myaer's deferred commissions.

[¶ 25] DALE V. SANDSTROM, CAROL RONNING KAPSNER and MARY MUEHLEN MARING, JJ., concur.

CROTHERS, Justice, dissenting.

[¶ 26] I respectfully dissent from Part II of the majority opinion. I would reverse the district court, making Part III unnecessary.

[¶ 27] The majority affirms after giving the word "accrue" technical meaning. Majority Opinion at ¶ 17 ("Considering the technical meaning given to the term 'accrue' in this context, we agree with the district court that, as a matter of law, Myaer is entitled to the deferred commissions."). I respectfully disagree with the majority's reliance on an encyclopedia and an aging Texas case to reach its conclusion. I also believe the majority erroneously deviates from North Dakota precedent requiring interpretation of contracts based on a plain and ordinary reading of terms and clauses to give the entire contract full effect.

[¶ 28] The majority relies on an insurance treatise for the proposition, "In the area of insurance policy commissions, the term 'accrue' has acquired a technical meaning to 'grow, increase, or augment, and does not apply to the unpaid portion of

a premium on a policy in force at the time [the agent's] contract was terminated.'" Majority Opinion at ¶ 16 (quoting 4 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 57:55, at p. 57–107 (3d ed.2005)). The *Couch* authors state:

> "[U]nder an agency contract provision that an agent's interest in premiums to 'accrue' on business secured is to cease on termination of his or her employment, 'accrue' means grow, increase, or augment, and does not apply to the unpaid portion of a premium on a policy in force at the time his or her contract was terminated, although the contrary would be true as to future renewal premiums."

4 Russ, *Couch on Insurance*, supra, § 57:55.

[¶ 29] The only authority relied on by the *Couch* authors is two Texas decisions, the more youthful of which was written in 1922, the other in 1918. Both are bereft of legal authority and, when their facts are examined, neither supports the majority's holding in this case.

[¶ 30] The first vintage case is *American Surety Co. v. Sheerin*, 203 S.W. 1120 (Tex.Civ.App.1918). Majority Opinion at ¶¶ 14–16. The majority correctly describes the issue in *Sheerin* as whether a broker was entitled to collect the second year commission on a two-year bond when the premium was paid annually but the broker's contract had been terminated before the second premium payment was due or made. Majority Opinion at ¶ 14. The majority accurately quotes the holding of the Texas court. However, lost in the majority's extensive quotation from *Sheerin* is that that court adopted its definition of "accrue" out of whole cloth. The definition's source or origin is not revealed. No case is cited. No dictionary is quoted. No contract is referenced. Rather, the court in *Sheerin* simply uttered, "'Accrue' means to grow, increase, augment, addi-

tional. Hence the provision has reference to premiums to accrue in the future as distinguished from those which have accrued, as we hold the premium in controversy did when the bond was written under the circumstances stated." 203 S.W. at 1122. The twin deficiencies of no authority and no analysis in *Couch* or in *Sheerin* become problematic when North Dakota's precedent is applied.

[¶ 31] Under North Dakota's rule of law, contracts are interpreted as follows:

> "'The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent.' Contract terms 'are read as a whole to determine the intentions of the parties and are given their plain, ordinary, and usual meaning.' '[E]ach term of a contract is construed to avoid rendering other terms meaningless.' 'A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense.' 'Where the language of a contract is unambiguous, the intent of the parties is to be gathered from the contract alone, and a court will not resort to construction where the intent of the parties is expressed in clear, unambiguous language.' 'Extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity.'"

*Schwarz v. Gierke*, 2010 ND 166, ¶ 16, 788 N.W.2d 302 (inside quotations and citations omitted).

[¶ 32] North Dakota law directs that we ascertain contractual intent from examination of words used in a contract, giving them their "plain, ordinary, and usual meaning." *Schwarz*, 2010 ND 166, ¶ 16, 788 N.W.2d 302 (quotation omitted). This Court often uses *Black's Law Dictionary* and *Merriam–Webster's Collegiate Dictio-*

*nary* to supply definitions of words used in a legal context. *See State ex rel. N.D. Dep't of Labor v. Matrix Props. Corp.,* 2009 ND 137, ¶ 10, 770 N.W.2d 290 ("The plain meaning of 'practice' as defined by *Black's Law Dictionary* is...."); *Chamley v. Khokha,* 2007 ND 69, ¶ 26, 730 N.W.2d 864 ("[T]he common definitions of 'expectation' and 'remuneration' from *Merriam–Webster's Collegiate Dictionary* 439 (11th ed.2005) and *Black's Law Dictionary* 1296 (6th ed.1990) seem plain enough."); *Western Nat. Mut. Ins. Co. v. Univ. of N.D.,* 2002 ND 63, ¶ 10, 643 N.W.2d 4 ("The plain, ordinary meaning of 'flood' is 'an overflowing of water on an area normally dry.' *Webster's New World Dictionary* 535 (2nd Coll. Ed.1980). *See Black's Law Dictionary* 1640 (6th ed.1990) (defining flood as inundation of water over land not usually covered by it)").

[¶ 33] Paragraph 15 of the contract between Myaer and Nodak provides, "Upon cancellation of this Contract, no further commission or premium credit shall accrue." The plain meaning of accrue in a legal context is "[t]o come into existence as an enforceable claim or right; to arise." *Black's Law Dictionary* 23 (9th ed.2009). *See also Merriam–Webster's Collegiate Dictionary* 9 (11th ed.2005), (accrue means "to come into existence as a legally enforceable claim"); *Dunford v. Tryhus,* 2009 ND 212, ¶¶ 6–7, 776 N.W.2d 539 (holding statute of limitations begins to run when the underlying cause of action accrues). Under these definitions, the plain meaning of paragraph 15 is that a Nodak insurance agent is not entitled to payment of commissions which do not exist or which are not due and payable prior to termination.

[¶ 34] Rather than rely on the ordinary meaning of accrue customarily used between contracting parties, the majority concludes without explanation that "the term 'accrue' has acquired a technical meaning to 'grow, increase, or augment, and does not apply to the unpaid portion of a premium on a policy in force at the time [the agent's] contract was terminated." Majority Opinion at ¶ 16 (quotation omitted). The selected "technical" definition is curious in that it represents a usage more suitable for application in situations other than a business contract. *See, e.g., Merriam–Webster's Collegiate Dictionary* 9 (11th ed.2005) ("accrue" also means "2 a: to come about as a natural growth, increase, or advantage <the wisdom that accrues with age> b: to come as a direct result of some state or action <rewards due to the feminine will accrue to me— Germaine Greer> 3: to accumulate or be added periodically <interest accrues on a daily basis> vt: to accumulate or have due after a period of time <accrue vacation time>").

[¶ 35] Although not entirely clear, it appears the district court's and the majority's analyses were clouded by a mistaken assumption that Myaer was already entitled to the commissions and that the commissions were already owed to Myaer subject only to the policyholder paying the final premium. The district court states:

"In both forms of the Contract an[d] Addendum C is attached which discusses [SIC] the payment of MPCI commissions. In both of the Addendums paragraph III.B. says:

'Career Producer will receive balance of commissions due on those policies that are paid in full in the month following processed premium.' {'premium payment' in 2004 form}

Nodak maintains that the payment in full is a new event leading to a new accrual. The position of Mr. Myaer is that payment in full only relates to the timing of the payment of his commission not to the accrual of the right to pay-

ment. Hence the importance of the definition of accrue.

"Unfortunately, the word 'accrue' and its meaning with regard to the relationship of the parties is not defined in the Contract. Nodak maintains that the Contract is unambiguous and that Nodak clearly has no further obligation to Mr. Myaer. If the Contract was really that clear we would not be dealing with this issue.

"*Black's Law Dictionary* (Eighth Edition) defines accrue as '[t]o come into existence as an enforceable claim or right....' *Black's* defines accrued compensation as '[r]enumeration that has been earned but not yet paid.' Also of interest is *Black's* definition of deferred compensation: '[p]ayment for work performed, to be paid in the future or when some future event occurs.'"

[¶ 36] The majority takes the district court's "deferred compensation" discussion a step farther by 11 times referring to Myaer's claim as one for payment of "deferred commissions." Majority Opinion at ¶¶ 1, 5, 6, 8, 11, 15, 17 and 24. In reality, no deferred commissions exist in this dispute. Because contract paragraph 6 prevented Myaer from earning commissions on premiums paid after termination of his contract, the phrase deferred commissions is a misnomer. Nodak's arrangement with its policyholders allowed for deferred payment of premiums, and Nodak contributed to the confusion by listing "deferred" commissions on its 2009 MPCI Commission Statement. However, words in a contract and not titles on columns in commission statements control the contracting parties' rights. Plain language in the contract directs the conclusion that deferred premium payments do not result in deferred commissions. Rather, under paragraph 6, deferred premium payments result in a current commission payment obligation *if*

a commission has been earned by the agent under the contract.

[¶ 37] The other Texas case relied on by *Couch* but not mentioned by the majority is *American National Insurance Co. v. Teague*, 237 S.W. 248 (Tex. Comm'n App. 1922), modified on rehearing 239 S.W. 604 (Tex. Comm'n App.1922). The question before the *Teague* court was whether an insurance agent was entitled to commissions for policies secured by the agent where premiums were paid after termination of the agent's contract. The Texas court did not cite *Sheerin*. Rather, the *Teague* court held:

"The contract provided for certain compensations which would be due and payable at the time premiums were received by the company. These amounts, if so received before the contract was terminated, were absolutely earned and due and payable. There were other compensations, such as renewals, which depended upon collection after the business was written, and which might not accrue until after the agency was terminated. The clause quoted clearly provides that the agent shall not be entitled to commissions on premiums collected after the termination of the agency under the provisions above quoted with reference to future business. We think the contract should not be construed as evidencing an intention on the part of the parties to the contract that sums unconditionally due and payable under the terms of the contract at the time of its termination should be forfeited to the company merely because they had not been actually paid to the plaintiff up to that time."

237 S.W. at 251–52, as modified 239 S.W. at 604–05.

[¶ 38] A careful reading of the *Teague* decision reveals it only marginally—if at all—supports the proposition for which it

is cited in *Couch*. First, *Teague* holds the agent's contract provided that Teague was entitled to commissions on premiums received by the company before termination. 237 S.W. at 251. Second, *Teague* holds the agent was not entitled to commissions on future business when commissions were collected after the agent's contract was terminated. *Id.* Third, without citation to legal authority, the *Teague* judges expressed their thought ("[w]e think") the contract should not be construed to deprive the agent of commissions that were "unconditionally due and payable under the terms of the contract at the time of its termination." *Id.* at 252. The *Teague* court used the word "accrue" but did not define it. *Id.* at 251. Nor did the court explain its definition of the term. However, by implication and context of use, it must apply to the third holding that commissions were recoverable after termination only when they were unconditionally due and owing when the contract was terminated. As explained below, the *Teague* court's holding is consistent both with the plain meaning of the word "accrue" that I am using and with the result I reach in this case.

[¶ 39] The contract between Myaer and Nodak provides when Myaer was entitled to earn a commission:

6. COMMISSIONS, CREDITS, AND REFUNDS. *Commissions on any policy or on added coverage shall be earned when:* (1) the policy or added coverage has been accepted by the Company or the other insurers identified in the Addendums to this Contract; (2) the policy is issued; *and (3) premium is received and processed by the Company.* Renewal commissions shall be earned when the renewal premium is received and processed by the Company and when credited on the Company's books. If, for any reason, there is a refund of any premium on any policy or contract, the commission shall be deducted on the refunded portion of any premium.

(Emphasis added.) The contract specified that all commissions and compensation due Myaer from Nodak were payable only according to terms of the contract:

9. COMMISSION OBLIGATIONS. All commissions, compensation and monies of any kind or nature to which Career Producer is entitled under this Contract are outlined in the various Addendums, which are incorporated herein as an integral part of this Contract. *Career Producer agrees that all bases for entitlement to compensation, commissions or monies for any reason are limited to the four corners of this Contract.*

(Emphasis added.) Finally, the contract addressed termination:

15. TERMINATION OF AGREEMENT AND OTHER TERMS. This Contract may be canceled by either party, with or without cause, at any time upon giving notice, in writing, to the other party.

This Contract may be immediately canceled, at the Company's option, upon termination of Career Producer's license to act as an insurance producer of the Company. Career Producer acknowledges that Company has not either expressly or otherwise, agreed to continue the term of this contract for any definite period of time. This Contract shall be automatically canceled upon the death of the Career Producer or upon determination by Company that Career Producer is totally disabled. In the event of the death of the Career Producer all commissions provided herein which are due and payable shall be paid to Career Producer's surviving spouse, next of kin or legal representative, as the Company may elect. *Upon cancellation of this*

*Contract, no further commission or premium credit shall accrue.*

(Emphasis added.)

[¶ 40] Here, the district court determined Myaer received all commissions on premiums paid prior to the July 7, 2009 termination of his contract. No appeal is taken from that determination. The dispute on appeal is about commissions Myaer claims Nodak was required to pay on premiums received by Nodak after termination of Myaer's contract.

[¶ 41] Under contract paragraph 6, Myaer could earn a commission after the premiums were received and processed by Nodak. Because the premiums on which Myaer claims commissions were not paid to Nodak before termination of Myaer's contract, those commissions were not earned by Myaer under plain terms of the contract. Commissions that have not been earned are not due and payable under contract paragraph 9. *See also Teague,* 237 S.W. at 252. Commissions that are not due and payable cannot accrue. *Id.*

[¶ 42] Reading all of the contractual provisions together, and giving them their plain and ordinary meaning as our law requires, the district court erred as a matter of law when it interpreted the contract. I would reverse, holding Nodak is not liable to Myaer because his claimed commissions have not been earned, nor have they accrued, as those terms are used in the contract.

[¶ 43] DANIEL J. CROTHERS, J.