2017 ND 25

Willard BURK, Plaintiff and Appellant

v.

STATE of North Dakota, BY AND THROUGH its BOARD OF UNIVERSITY AND SCHOOL LANDS and Ryan Rauschenberger, Tax Commissioner of the State of North Dakota, Defendants and Appellees

No. 20160108

Supreme Court of North Dakota.

Filed 2/16/2017

Joel M. Fremstad, P.O. Box 3143, Fargo, N.D. 58108-3143, for plaintiff and appellant.

Hope L. Hogan, Office of the Attorney General, 500 North Ninth Street, Bismarck, N.D. 58501-4509, for defendant and appellee Board of University and School Lands.

Charles L. Dendy (appeared), Special Assistant Attorney General, 600 East Boulevard Avenue, Bismarck, N.D. 58505, for defendant and appellee Tax Commissioner of the State of North Dakota.

McEvers, Justice.

[¶ 1] Willard Burk appeals from a judgment declaring his claim that the State, through the Board of University and School Lands, and the Tax Commissioner (collectively "State"), have wrongfully withheld gross production and extraction taxes from his share of oil and gas royalties was frivolous, entitling them to an award of attorney fees. We affirm the district court's decision that, as a matter of law, the State's settlement agreement with Burk did not exempt him from paying gross production and extraction taxes on his royalty interest, but we reverse the award of attorney fees because Burk's claim against the State is not frivolous.

I

[¶ 2] In 1991 Burk purchased a tract of Williams County land from the Bank of North Dakota, which acted as an agent for the State Treasurer. The quit claim deed reserved 50 percent of the mineral interest in the Bank. In 2004 the Board of University and School Lands entered into an oil and gas lease with Powers Energy Corporation for 100 percent of the mineral interest in the property. In 2007 Burk entered into an oil and gas lease with Cody Oil & Gas Corporation. Zavanna, LLC, subsequently drilled a well on the property.

[¶ 3] A 2008 title opinion informed Zavanna the State owned 100 percent of the minerals because the Bank, acting on behalf of the State Treasurer, was not authorized to convey minerals, and therefore, Burk's lease with Cody was ineffective.

See N.D.C.C. § 15–08.1–03 ("All mineral interests that may be acquired by the Bank of North Dakota ... must be transferred, assigned, conveyed, and granted to the state of North Dakota, acting by and through the board of university and school lands.") Settlement negotiations ensued between Burk and the State which resulted in a 2011 settlement agreement. The Board, which had the authority to convey the State's mineral interests, agreed to convey the property to Burk through a quit claim deed reserving 50 percent of the mineral interest. Under the agreement, Burk also ratified the Board's lease to Powers.

[¶ 4] In 2012 Burk sued Zavanna in federal court claiming it was unlawfully withholding gross production and extraction taxes from his royalties. Burk asserted that under the settlement agreement with the State he was entitled to tax-exempt royalties. The federal court granted Zavanna's request under Fed. R. Civ. P. 11 to strike this allegation from the complaint because state "regulations leave no room for Burk to argue that he assumed the benefit of the State's tax exemption when he acquired his royalty interest from the State and an interest under the State's existing lease via the Settlement Agreement." The federal court refused to award attorney fees as a sanction, however, because Burk and his attorney acted in "good faith."

[¶ 5] Through a different attorney, Burk brought this state court declaratory judgment action against the State in April 2015, claiming his royalties should not be subject to taxation based on the parties' settlement agreement. The district court granted the State's motion for summary judgment dismissing the action, concluding "[t]heir agreement has to do with mineral interests and nothing to do with the tax saying that Mr. Burk wouldn't have to pay

the gross production tax." The court also found the claim was frivolous and awarded the State $5,682.18 in attorney fees because "it's pretty much the same thing" as the federal court action.

## II

[¶ 6] Burk argues the district court erred in granting summary judgment dismissing his action against the State.

[¶ 7] Our standard of review for summary judgments under N.D.R.Civ.P. 56 is well-established:

Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.... Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

Tank v. Citation Oil & Gas Corp., 2014 ND 123, ¶ 8, 848 N.W.2d 691 (quoting Estate of Christeson v. Gilstad, 2013 ND 50, ¶ 6, 829 N.W.2d 453).

## A

[¶ 8] There is no dispute in this case that Burk ordinarily would be subject to payment of taxes on the oil produced and extracted from the property covered by his oil and gas lease. See N.D.C.C. §§ 57–51–02 (gross production tax) and 57–51.1–02 (oil extraction tax). The property of the state, however, is exempt from taxation. See N.D. Const. art. X, § 5. Therefore, royalty interests owned by the state are exempt from both the gross production tax

and the oil extraction tax. See N.D. Admin. Code §§ 81–09–02–15(1)(b) and 81–09–03–01. Burk argues he obtained the state's tax exempt status through the 2011 settlement agreement.

[¶ 9] A settlement agreement is a contract and the parties' rights and responsibilities are limited by the terms of the agreement. See Kuperus v. Willson, 2006 ND 12, ¶ 11, 709 N.W.2d 726. The interpretation of a written contract generally is a question of law for the court, making summary judgment an appropriate method of disposition in contract disputes. See Myaer v. Nodak Mut. Ins. Co., 2012 ND 21, ¶ 10, 812 N.W.2d 345. We have outlined the rules for interpretation of written contracts:

> Contracts are construed to give effect to the mutual intention of the parties at the time of contracting. The parties' intention must be ascertained from the writing alone if possible. A contract must be construed as a whole to give effect to each provision, if reasonably practicable. We construe contracts to be definite and capable of being carried into effect, unless doing so violates the intention of the parties. Unless used by the parties in a technical sense, words in a contract are construed in their ordinary and popular sense, rather than according to their strict legal meaning.
>
> If a written contract is unambiguous, extrinsic evidence is not admissible to contradict the written language. However, if a written contract is ambiguous, extrinsic evidence may be considered to show the parties' intent. Whether or not a contract is ambiguous is a question of law. An ambiguity exists when rational arguments can be made in support of contrary positions as to the meaning of the language in question.

Kuperus, at ¶ 11 (quoting Lire, Inc. v. Bob's Pizza Inn Rests., Inc., 541 N.W.2d 432, 433–34 (N.D.1995)). When the language of a contract is plain and unambiguous and the parties' intentions can be ascertained from the writing alone, extrinsic evidence is inadmissible to alter, vary, explain, or change the document. See Nichols v. Goughnour, 2012 ND 178, ¶ 12, 820 N.W.2d 740.

[¶ 10] The parties' six-page settlement agreement does not mention "taxes" of any kind, but provides in pertinent part:

> WHEREAS, the Parties intend for Willard Burk to receive the royalty payments attributable to 50% of the oil and gas from the Property as determined under the State's Lease and all of the Disputed Royalty Payments currently held in suspense by Zavanna and attributable to the Title Issues, after deductions for amounts due third parties, in exchange for the Burks releasing the State and the Board of University & School Lands from any liability incurred in relation to this matter.
>
> NOW, THEREFORE, for and in consideration of the mutual promises, covenants and obligations contained herein, the Parties further agree as follows:
>
> . . . .
>
> 1.1 Deed. At Closing, subject to the terms and conditions hereof, the Board of University and School Lands, shall execute and deliver to Willard Burk the Quitclaim Deed attached as Ex. A (the "2011 Quitclaim Deed"). The 2011 Quitclaim Deed states that the Board of University & School Lands conveys the Property to Willard Burk but reserves and excepts to the State 50% of the minerals underlying the Property. This deed is intended to help resolve the Title Issues. Upon issuing the 2011 Quitclaim Deed to Willard Burk, the State of North Dakota owns 50% of the minerals underlying the Property and Willard Burk owns the other 50% of the miner-

als. The deed is to ensure or confirm that Willard Burk is in the position regarding mineral ownership that he thought he was in under the 1991 Quitclaim Deed, that is, owning 50% of the minerals. The 2011 Quitclaim Deed does not expand Willard Burk's mineral ownership in the Property beyond 50%. Celia Burk is not named as a Grantee in the 2011 Quitclaim Deed because in 2009 she conveyed to Willard Burk her entire interest in the Property and she does not assert and no longer has any interest in the Property.

. . . .

1.2 The Parties' Leases.

The State did not convey mineral title to the Burks by the 1991 Quitclaim Deed. The State owned 100% of the minerals underlying the Property prior to execution of this Agreement and the 2011 Quitclaim Deed. Accordingly, the State's Lease is valid, and the Burks' Lease is not valid. The 2011 Quitclaim Deed is subject to the State's Lease. The interest acquired by Willard Burk under the 2011 Quitclaim Deed is subject to the Burks' Lease; but the Burks' Lease is not the controlling lease for the purpose of determining amounts due Burk as long as the State's Lease is in effect. Burk hereby ratifies the State's Lease as to the 50% of the minerals from the Property to the same effect as if he had originally entered into said Lease.

A purpose of this Agreement is for Willard Burk to assume the Board of University and School Land's place for a 50% interest in the State's Lease, but not otherwise disturb the current interest holders (such as working interest and overriding interest owners) under that lease. The 2011 Quitclaim Deed and this Agreement will not otherwise affect the way Zavanna has previously paid the State, the working interest holders, the overriding interest holders, or any other holders of interest in the Well.

. . . .

2.2 Conditions. The obligations of the Parties under this Agreement are subject to fulfilling (or waiver by the appropriate party) on or prior to the Closing Date the following conditions:

. . . .

(b) Consents. The Parties shall have obtained, in form and substance reasonably satisfactory to the Parties, Zavanna's consent to recognize the 2011 Quitclaim Deed and Zavanna's agreement to release the Disputed Royalty Payments to the parties due them after giving full affect to the State's Lease upon execution of this Agreement.

. . . .

4.2 Assignment. The Board of University & School Lands assigns and transfers to the Willard Burk (in his individual capacity) 50% of the State's past and future right, title, privilege, and interest to royalties due to the State under the State's Lease. This is intended to have the effect of Zavanna releasing the Disputed Royalty Payments to Willard Burk (in his individual capacity) and any other third parties due any portion of the suspended payments and to assign 50% of all future royalty payments that would have been due to the State under the State's Lease to Willard Burk (in his individual capacity).

. . . .

5.9 Entire Agreement. This Agreement constitutes the entire agreement of the Parties with regard to the subject matter hereof, and contains all the covenants, promises, representations, warranties, and agreements between the Parties. Without limiting the scope of the preceding sentence, all understand-

ings and agreements preceding the date of execution of this Agreement and relating to the subject matter hereof are hereby null and void and of no further force and effect, and this Agreement shall supersede all other agreements, written or oral.

Burk also submitted an affidavit in which he explained:

In or about June 2011, my attorney provided me the original draft of the settlement agreement that had been prepared by AAG Carvell. At the time this draft was provided, my attorney noted that the State was exempt from production taxes. As such, I understood from this early draft that if I agreed to the settlement, my portion would not be subject to such taxes, because it was not my lease being recognized, but rather for payment purposes the State was to be considered the 100% owner, which then meant I would get half of the State's payment, without any reduction for taxes, because the State's proceeds were exempt. This remained my understanding as additional drafts were circulated and remains my understanding today.

The State's actions in regard to me have been difficult mentally, physically, and financially. All told, I estimate I have incurred in excess of $75,000.00 in attorney fees and other damages, not even including the lost royalties due to taxes, and this amount is continuing to increase. In addition, have spent hundreds of hours gathering information, attending meetings, trying to work with the State, and researching. I entered into a Settlement Agreement with the State despite all of this, with the understanding that I would get 50% of its revenues from production and that this would not be subject to a deduction for taxes. It may be that the State did not anticipate this, but I did and I ask that this Court uphold the settlement that has been reached.

[¶ 11] Burk relies on discussions during settlement negotiations where taxes were not specifically mentioned, but indicated he would receive 50 percent of "what the State is entitled to." Burk also relies on the "plain language" of the settlement agreement, which stated in part Burk would receive "royalty payments attributable to 50% of the oil and gas from the Property as determined under the State's Lease" (prefatory "Whereas" statement); the State assigns royalties "due to the State under the State's Lease" and "50% of all future royalty payments that would have been due to the State under the State's Lease to Willard Burk" (Section 4.2); the parties consent to release disputed royalty payments "after giving full affect to the State's Lease" (Section 2.2(b)); and "[a] purpose of this Agreement is for Willard Burk to assume the [Board's] place for a 50% interest in the State's Lease" (Section 1.2). Because royalty payments to the State are exempt from the production and extraction taxes, Burk argues the settlement agreement requires that no taxes be withheld from his royalty payments either.

[¶ 12] We conclude the plain language of the settlement agreement does not provide Burk a tax-free royalty interest. First, and foremost, the State's alleged waiver of taxes is not clearly spelled out in the written agreement. There is no mention of gross production taxes or extraction taxes in the parties' six-page settlement agreement and the settlement agreement has an "Entire Agreement" clause stating the agreement supersedes all prior written or oral agreements. If tax exemptions were intended to be an important part of the settlement agreement, it defies logic to suggest that taxes would not have been specifically

mentioned. Implying a waiver of taxes from language stating Burk "assume[s] the [Board's] place" would lead to ludicrous results. The agreement cannot be interpreted to provide Burk with all of the unique characteristics associated with the State.

[¶ 13] Second, we must construe the agreement as a whole to give effect to each provision. See Myaer, 2012 ND 21, ¶ 10, 812 N.W.2d 345. Section 1.1 of the settlement agreement states the "deed is to ensure or confirm that Willard Burk is in the position regarding mineral ownership that he thought he was in under the 1991 Quitclaim Deed," and section 1.2 states "Burk hereby ratifies the State's Lease as to the 50% of the minerals from the Property to the same effect as if he had originally entered into said Lease." Read together, these provisions establish that the parties intended to place Burk in the same position he enjoyed under the 1991 quitclaim deed, when he clearly would have been subject to paying gross production and extraction taxes.

[¶ 14] Third, Burk all but concedes a tax exemption was not agreed upon by the parties when Burk explained in his affidavit, "[i]t may be that the State did not anticipate [his royalties would not be subject to a tax deduction], but I did and I ask that this Court uphold the settlement that has been reached." This is a textbook example of the "secret intention" concept in contract law:

> As this court said long ago at paragraph 8 of the Syllabus by the court in Harney v. Wirtz, 30 N.D. 292, 152 N.W. 803 (1915): "The secret intention of the parties, if different from the expressed intention, will not prevail, as the law looks to what the parties said as expressing their real intention." See also, Jurgens v. Heisler, 380 N.W.2d 329, 331 (N.D.1986): "'[T]he intention recognized by the

court is to be ascertained from the acts of the owner, and not from the purpose hidden in his mind'" [quoting Ramstad v. Carr, 31 N.D. 504, 154 N.W. 195, 199 (1915) ].

Westhoff v. Klem, 436 N.W.2d 243, 245 (N.D.1989).

[¶ 15] We agree with the district court that the settlement agreement can only reasonably be interpreted as addressing the 50 percent reservation of the mineral interest, not tax exemptions. We conclude the terms of the agreement are unambiguous and do not provide Burk the tax exemption he seeks.

### B

[¶ 16] Burk also argues there are questions of fact regarding his estoppel claim against the State because he "understood he was not going to have his share reduced by taxes."

[¶ 17] In the rare circumstances in which government estoppel applies, there must be good faith reliance upon the conduct or statements of the party to be estopped. See, e.g., Blocker Drilling Canada, Ltd. v. Conrad, 354 N.W.2d 912, 920 (N.D.1984). In his affidavit Burk points to no conduct or statement by a state official or employee that led him to believe his royalty payments would not be subject to taxes. Rather, according to the affidavit, it was Burk's lawyer who suggested to him that his royalties were tax exempt.

[¶ 18] We conclude Burk failed to raise a genuine issue of material fact to support his claim of government estoppel.

### C

[¶ 19] Burk argues the court erred in denying his request under N.D.R.Civ.P. 56(f) for more time to conduct discovery before ruling on the summary judgment motion.

[¶ 20] A district court's denial of a request for additional time for discovery under N.D.R.Civ.P. 56(f) will not be overturned on appeal absent an abuse of discretion. See Hopfauf v. Hieb, 2006 ND 72, ¶ 8, 712 N.W.2d 333. A court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, or if it misinterprets or misapplies the law. See Choice Fin. Grp. v. Schellpfeffer, 2006 ND 87, ¶ 9, 712 N.W.2d 855.

[¶ 21] Burk claims "further discovery is warranted into whether anyone involved with the Settlement Agreement ever considered N.D.C.C. ch. 57-51 [oil and gas taxes] while the Settlement Agreement was negotiated." Not only has Burk failed to explain why this information was not previously obtained, see Schellpfeffer, 2006 ND 87, ¶ 12, 712 N.W.2d 855, but any evidence obtained would not be admissible to alter the plain and unambiguous language of the document. See Goughnour, 2012 ND 178, ¶ 12, 820 N.W.2d 740. Consequently, this information would not preclude summary judgment. We conclude the district court did not abuse its discretion in denying the motion.

III

[¶ 22] Burk argues the district court erred in finding his action is frivolous and awarding the State attorney fees.

[¶ 23] Under N.D.C.C. § 28–26–01(2), a claim is frivolous supporting an award of costs and attorney fees "if there is such a complete absence of actual facts or law that a reasonable person could not have thought a court would render judgment in that person's favor." An award of attorney fees under N.D.C.C. § 28–26–01(2) is within the discretion of the district court and will only be disturbed on appeal for an abuse of that discretion. See Strand v. Cass County, 2008 ND 149, ¶ 11, 753 N.W.2d 872. The court here found the

claim was frivolous because the federal court found it frivolous and "it's pretty much the same thing."

[¶ 24] The federal and state cases were not "the same thing." Burk sued Zavanna, which was the producer, in federal court and that court relied on state regulations to conclude the claim was frivolous. Burk's different attorney here in the state court action relies on the construction of the settlement agreement and the negotiations leading up to it. See Soentgen v. Quain & Ramstad Clinic, P.C., 467 N.W.2d 73, 85–86 (N.D.1991) (court abused its discretion in concluding breach of contract claim was frivolous). While we conclude the claim is not meritorious, affirmance of a summary judgment on appeal does not mean that a claim is frivolous. See, e.g., Peterson v. Zerr, 477 N.W.2d 230, 236 (N.D.1991). Given the court's exclusive reliance on the federal court's finding of frivolousness and the State's actions which caused this controversy, we conclude the court abused its discretion and reverse the award of costs and attorney fees. We also deny the State's request for costs and attorney fees for the appeal under N.D.R.App.P. 38.

IV

[¶ 25] In view of our disposition of this case, it is unnecessary to address other issues raised. We affirm the district court's summary judgment dismissing Burk's claim, but we reverse the court's award of attorney fees to the State.

[¶ 26] Lisa Fair McEvers

Daniel J. Crothers

Dale V. Sandstrom, S.J.

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.

[¶ 27] The Honorable Jerod E. Tufte was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge Dale V. Sandstrom, sitting.